Robert D. COOK, Plaintiff–Appellant,

v.

AMERICAN STEAMSHIP COMPANY,
Defendant–Appellee.

No. 93–1571.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 26, 1994.

Decided May 5, 1995.

Donald A. Krispin, Robert A. Jenkins (argued), Jaques Admiralty Law Firm, Detroit, MI, Leonard C. Jaques (briefed), The Maritime Asbestosis Legal Clinic, Detroit, MI, for plaintiff-appellant.

Thomas W. Emery (argued), Daniel S. Saylor, David M. Shafer (briefed), Garan,

Lucow, Miller, Seward, Cooper & Becker, Detroit, MI, for defendant-appellee.

Before: RYAN and SILER, Circuit Judges; DOWD, District Judge.*

RYAN, Circuit Judge.

The plaintiff, Robert D. Cook, appeals from the judgment entered after a jury verdict in this action for negligence under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness. Cook brought suit after he was injured when a line that was supporting him in a bos'n's chair parted and he fell to the dock. The jury awarded Cook compensatory damages, but reduced them by 50% for Cook's comparative negligence.

Cook assigns error to three of the district court's rulings: 1) the admission of expert opinion as to the cause of the line's parting; 2) the denial of Cook's motion for a directed verdict on the issues of unseaworthiness and comparative negligence; and 3) the admission of evidence of Cook's alcohol related ailments.

Our holding is threefold: First, the district court erred when it allowed American Steamship's expert to offer his opinion as to the cause of the line's parting because the opinion was not expert testimony. Second, the district court erred in denying Cook's motion for judgment as a matter of law on the issue of unseaworthiness, but it did not err in denying Cook's motion for judgment as a matter of law on the issue of comparative negligence. Third, the district court did not err when it allowed the defendant to introduce evidence of Cook's alcohol related ailments. Therefore, the judgment entered below must be vacated and the case remanded for a new trial.

## I.

Robert Cook worked as a deckhand for the defendant, the American Steamship Company. On the afternoon of December 26, 1990, Cook was working aboard the Motor Vessel BUFFALO, which was entering the port of Escanaba, Michigan, to take on a load of iron ore. Escanaba is located on the southern shore of Michigan's upper peninsula, on Lake Michigan. Because there were no personnel on the dock at Escanaba to assist the BUFFALO in tying up, one of the ship's crew had to be lowered to the dock. This was a common procedure and was accomplished by lowering a crewman on a bos'n's chair, which was basically a board supported by a line, much like a child's playground swing. The line supporting the bos'n's chair is threaded through a large boom on the ship; the boom is swung out over the dock side of the vessel; and the crewman is lowered to the dock. On the day in question, the lake was turbulent and the temperature was below freezing. Cook was the most experienced deckhand on duty that afternoon and he was designated to be lowered on the bos'n's chair.

Ordinarily, the crew would have an hour to rig the boom with the bos'n's chair, but the lake was so rough, the ship's master, Captain Edward Derry, ordered that no one go on deck until the BUFFALO had passed the breakers of Escanaba harbor. This left the crew with only 15 to 20 minutes to complete the rigging of the boom. Worsening matters was the large amount of ice that had formed on the deck and the boom. The spray from the rough sea quickly froze wherever it landed on the ship in the sub-zero temperatures and wind. Cook and crewman Gordon Cherup used propane torches to deice the boom. These torches had a large tank connected to a three foot wand that emitted a one foot flame.

The boom has a 27-foot horizontal arm from which hang two pulleys. The horizontal arm is connected to a vertical post that pivots on two bearings. One bearing is at deck level and the other is chest high. While the ship is moving, the boom is secured inboard. When the crew is ready to lower someone in the bos'n's chair, the boom is swung outboard over the dock.

When Cook tested the boom, it would not swing out because the crew had failed to change the grease in the bearings from sum-

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

mer to winter grease and the summer grease had frozen. To correct the problem, Cook applied the flame of his torch to the bearings. He worked on each bearing for several minutes before the grease loosened up enough for the boom to pivot.

After Cook had finished with the bearing at chest height, but while he was still working on the bearing at deck level, crewman Kirk Austin began to rig the line for the bos'n's chair. The line attached to the bos'n's chair was kept in the windlass room, which is waterproof and heated by two powerful gas heaters. The line was 3/4 diameter manilla rope approximately 134 feet long. The crew had used this line for some time, and in the summer months it had been left rigged while the ship traveled from port to port. Cook used his deicing torch on the deck level bearing for perhaps a minute after Austin finished rigging the line.

Austin rigged the line by feeding it through the two pulleys that hung from the boom. He passed the line around the post, ran it around a cleat, and coiled it on the deck. This rigging would allow the third mate to feed the line out slowly, lowering Cook in the bos'n's chair. Austin was to be the second man lowered to the dock after Cook.

When everything was ready, Cook mounted the bos'n's chair, the crew swung the boom out, and the third mate, Dominick Gorno, began to feed out the line. When Gorno had fed out about 10 feet of line, the line parted and Cook fell about 20 feet to the dock. Cook's left arm and wrist fractured, his left heel was crushed, and he suffered a back injury. He was taken to the hospital and treated for his injuries.

After the accident, the line that had parted was removed from the boom and stored in the windlass room. The crew prepared accident reports for the U.S. Coast Guard and for the American Steamship Company. Captain Derry notified the company by telephone of the accident. Don Pfohl, one of the company's accident investigators, and Thomas Emery, one of its attorneys, met the BUFFALO at its next port of call, Ashtabula, Ohio, and took possession of the line that had parted.

One of Cook's theories at trial was that the BUFFALO had been unseaworthy because the line had parted in its normal functioning. Cook also claimed that the vessel owner was negligent and that Cook was entitled to recover for his injuries under the Jones Act, 46 U.S.C. § 688. American Steamship's counter-theory was that Cook had somehow burned the line with his torch, and that his negligence in doing so was the *sole* cause of the line parting and of his injuries. Cook alleged that he was permanently disabled because of his injuries. American Steamship countered that Cook would be fit to return to work except for his alcohol related ailments.

The jury found that the BUFFALO had been unseaworthy and that American Steamship had been negligent. The jury found that Cook's damages were $200,000, but that he had been 50% negligent. A judgment in Cook's favor for $100,000 was entered. Cook timely filed notice of appeal.

## II.

### A.

Cook's first claim on appeal is that the district court erred in allowing American Steamship's expert, Michael Timmons, to offer his opinion as an expert that the cause of the accident was that the line supporting Cook had parted because it had been burned. Cook argues that Timmons was not qualified to render this opinion.

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the standards for admissibility of expert testimony are found in Fed.R.Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The first and universal requirement for the admissibility of expert opinion testimony is that the evidence must be reliable

and relevant. Under *Daubert, id.* at —— ——, 113 S.Ct. at 2796–97, the reliability requirement is met if the trial judge makes a preliminary finding under Fed.R.Evid. 104(a) that the scientific or technical theory which is the basis for the expert's opinion is indeed "scientific, technical, or ... specialized knowledge." Also, the relevancy requirement is met if the trial judge determines, under 104(a), that the expert's opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

Many opinions from this and other circuits have declared that a district court's decision to admit expert testimony is reviewed for an abuse of discretion.[1] That statement is an oversimplification and is often incorrect; and, in all events, does not adequately describe the standard of review required by the Federal Rules of Evidence for the admissibility of expert opinion evidence.

█ Appellate review of trial court rulings on the admissibility of expert opinion testimony under Fed.R.Evid. 702, depending upon the assignment of error, may involve as many as three separate standards of review. The trial court's preliminary factfinding under Rule 104(a) is reviewed for clear error. These facts include, but are not limited to, whether the witness's "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, are such as to qualify him or her to testify as an expert at all, and it may include a determination of the tests or experiments that the proffered expert conducted, if any. The court's determination whether the opinion the expert wishes to offer is properly the subject of "scientific, technical, or other specialized knowledge" is a question of law we review *de novo.* An example of that sort of legal determination by the trial court is detailed in the Supreme Court's opinion in *Daubert,* —— U.S. ——, 113 S.Ct. 2786, in which the Court explained that part of a trial court's "gatekeeping" function under rule 702

when, for example, scientific opinion testimony is offered, is the determination whether "the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at ——, 113 S.Ct. at 2796. A comparable duty is imposed upon the trial court when the subject of the proposed opinion testimony is not "scientific" knowledge, but "technical, or other specialized knowledge." Finally, the trial court's determination whether the proffered expert opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, is a relevancy determination and therefore one we review for abuse of discretion.

## B.

Cook claims that Timmons's opinion testimony was inadmissible because Timmons was not qualified as an expert in testing ropes. While the claim may be true, it misses the real problem with Timmons's testimony, which is whether Timmons's testimony was expert opinion at all. That is to say, whether it was an inference based upon any "scientific, technical, or other specialized knowledge." We review the determination that it was *de novo.*

█ Timmons was an employee of the Buffalo Testing Laboratories in Buffalo, New York. He has an Associate's Degree in Materials Science, and has worked in Buffalo Testing's Metallurgical Department for 13 years, for the last 10 years as its manager. Buffalo Testing was in the business of testing various products and components to determine their capacity to withstand stress and to ascertain whether they complied with specifications. Timmons testified that he was most familiar with metals, but that he also had some experience with plastic, rubber, cement, and ceramic. He testified that the techniques he had used to test other substances were also applicable to a failure analysis of rope. The district court ruled

---

1. *See, e.g., United States v. Montas,* 41 F.3d 775 (1st Cir.1994); *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 734, 130 L.Ed.2d 637 (1995); *United States v. Sanchez–Galvez,* 33 F.3d 829 (7th Cir.1994); *United States v. Speer,* 30 F.3d 605 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 603, 130 L.Ed.2d 514 (1994), and *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Allgeier v. United States,* 909 F.2d 869 (6th Cir.1990); *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266 (6th Cir.1988); and *Mannino v. International Mfg. Co.,* 650 F.2d 846 (6th Cir. 1981).

that Timmons was an expert in testing and that he would be allowed "to testify as an expert in the testing area." We think the district court did not clearly err in its finding that Timmons had expertise in stress and failure testing.

■ The real problem, as we have said, is whether the opinion rendered by Timmons was *expert* testimony at all in the sense that it was within the ambit of his expertise as defined by the trial court; that is, whether it was "scientific, technical, or other specialized knowledge" based upon his expertise "in the testing area." This, as we have said, is an issue we review *de novo*.

American Steamship provided Timmons with one end of the line that had parted. It also provided him with another 13–foot section of line on which to perform tests. Timmons mistakenly believed that this 13–foot section of line had been taken from the line that had parted. He performed no test whatever on the 13–foot section, but instead, sent it to a Missouri testing lab for a "failure analysis." That lab's tests showed that the 13–foot section of line failed under a strain of over 4,000 pounds, but the jury was not permitted to learn that because the district court ruled that the information was hearsay. Timmons did not learn until he was testifying at trial that the 13–foot section had not come from the length of line that had parted, but rather had been cut from the same spool from which the parted line had been cut. This means that the 13–foot section was new line whereas the line that had parted had been used for a long period of time and, according to Cook, was sometimes left exposed to the elements. Timmons's misunderstanding, in itself, casts serious doubt upon the reliability of any conclusions that he reached.

What is even more crucial is that Timmons testified that he performed no tests at all on the line that had parted. The only "test" Timmons conducted was to visually examine the frayed end of the line with the naked eye and under a low power microscope. Timmons testified that he observed char marks on the tips of some of the rope fibers where the line had parted. He observed no other visible defects on the line.

Timmons had also applied the flame of a torch to a thin piece of rope he brought with him to court; rope which had nothing to do with the line involved in this case. This rope was thinner than the line that had parted, and there was no indication that the torch that Timmons had used to burn this piece of rope was similar to the torch that Cook had used to deice the boom or that the flame was applied in a manner having any similarity to what occurred aboard the BUFFALO. The significance Timmons attached to burning this rope is unclear.

Timmons testified that he believed the line parted because it was weakened by exposure to a "localized heat source." By referring to a "heat source" rather than a flame, Timmons's testimony could support either of American Steamship's theories at trial: that Cook accidentally burned the rope with a torch or that he "super heated" the bearing on which he was working and that bearing then burned the rope.

We conclude that Timmons's testimony was not based upon any "scientific, technical, or other specialized knowledge" at all, nor was it based upon any testing, which is the "expertise" to which the district court limited Timmons's expert opinion. Timmons concedes that he did no testing on the line in question. He simply examined the line at the place where it parted and observed some char marks on some of the fibers; that much the jurors could have done, and presumably did do. Timmons's opinion that a "localized heat source" caused the line to part at the place where the char marks appeared was not "scientific, technical, or other specialized knowledge" based upon "testing" conducted, as *Daubert* requires, in accordance with valid scientific "methodology" in order to permit Timmons to draw inferences that are beyond the "ken" of lay jurors. Timmons's causation opinion, adorned as it was in the dress of scientific or technical expertise and fortified by the court's later instruction to the jury calling it "expert opinion," was not expert testimony under Rule 702. It is precisely this kind of testimony that the Supreme Court in *Daubert* admonished federal courts to screen for scientific validity as a part of the courts' "gatekeeping function."

We hold that Timmons's opinion was not admissible as an expert opinion because he failed to perform tests or otherwise call upon any "scientific, technical, or other specialized knowledge" that would have given him a valid basis upon which to form his opinion. The evidence can only have unfairly influenced the jury in its findings concerning Cook's alleged negligence.

## III.

### A.

■ Cook assigns error to the district court's denial of his motion for a directed verdict on the issues of unseaworthiness and comparative negligence. Before trial, Cook made a motion for partial summary judgment asking the district court to find that: 1) the BUFFALO was unseaworthy as a matter of law, and 2) Cook was not "contributorily negligent." The motion was denied. Cook renewed this request at the close of all the proofs, thus making it, at that time, one for "directed verdict." Although American Steamship argues that Cook failed to renew his motion regarding the comparative fault issue, a review of the record indicates that when Cook's counsel renewed his motion, he referred to his brief submitted for the motion for partial summary judgment and then went on to discuss both the issues of unseaworthiness and Cook's own negligence. We think the renewed motion addressed both unseaworthiness and comparative negligence, and thus properly preserved both issues for review.

■ The 1991 amendments to the Federal Rules of Civil Procedure replaced the term "directed verdict" with "judgment as a matter of law." Fed.R.Civ.P. 50(a). A district court's grant or denial of a motion for judgment as a matter of law is reviewed *de novo*. We must apply the same legal standards as the district court, that is, we view all evidence in the light most favorable to the nonmoving party, and we give the nonmoving party the benefit of all reasonable inferences. Only where no reasonable juror could find for the nonmoving party is judgment as a matter of law appropriate. *Manzer v. Dia-*

*mond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir.1994).

### B.

As a preliminary matter, we pause to clarify the terminology that is appropriate to the resolution of this issue. While Cook loosely uses the term "contributory negligence," the proper term is "comparative fault" or "comparative negligence." Contributory negligence was a defense at common law that completely barred a plaintiff's recovery, but admiralty law had rejected the rule of contributory negligence in favor of comparative fault long before it was rejected by most common law systems.

■ It is also important to distinguish between the two different causes of action that Cook has brought: 1) negligence under the Jones Act; and 2) unseaworthiness of a vessel. The Jones Act, 46 U.S.C. § 688, allows seamen to sue their employers for negligence resulting in injuries and grants seamen all the benefits of suits brought under the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.* In an action under the Jones Act, a plaintiff's negligence is not a complete bar, but rather reduces his damages as comparative fault. *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

■ Unseaworthiness is a cause of action based in admiralty law, and the due care of the ship owner is not an issue. The parties disagree about the nature of an owner's liability under the doctrine of unseaworthiness. Cook argues that the owner's liability is "strict," and American Steamship argues that unseaworthiness does not amount to insuring the vessel against accident. While courts often quote the statement that the doctrine of unseaworthiness is "a species of liability without fault,"[2] that formulation is somewhat misleading, and the label "strict liability" is imprecise.

■ In discussing the origins and nature of the doctrine of unseaworthiness, the Supreme Court has stated:

**2.** *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94– 95, 66 S.Ct. 872, 877–78, 90 L.Ed. 1099 (1946).

[Since the day when the Court decided *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944)], the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care.

*Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960). The Court went on to clarify this standard:

What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service.

*Id.* at 550, 80 S.Ct. at 933. This formulation is not consistent with the traditional notion of strict liability. A party *strictly liable* is a virtual insurer against all injuries proximately caused by his actions; reasonableness plays no role in the analysis. But the Court's formulation of the owner's liability under the doctrine of unseaworthiness introduces reasonableness into the formula. The available defenses also distinguish unseaworthiness from traditional strict liability. A party strictly liable may raise the defense of assumption of the risk, but not comparative negligence. A ship owner, on the other hand, may not raise the defense of assumption of the risk, but may raise the defense of comparative negligence. *Tolar v. Kinsman Marine Transit Co.,* 618 F.2d 1193 (6th Cir. 1980).

■ Correctly stated, the rule is that the admiralty doctrine of unseaworthiness imposes an absolute, nondelegable duty on a ship owner to provide a vessel and its equipment, appurtenances, and crew reasonably suited for their intended purpose. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

In *Usner,* the Court addressed and soundly rejected the claim that there could be "instantaneous unseaworthiness" created by the negligent operation of an otherwise fit piece of equipment. The Court again clarified the nature of a claim of unseaworthiness:

[Unseaworthiness] is a remedy separate from, independent of, and additional to other claims against the shipowner, whether created by statute or under general maritime law.... [L]iability based upon unseaworthiness is wholly distinct from liability based upon negligence. The reason, of course, is that unseaworthiness is a *condition,* and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it.

*Id.* at 498, 91 S.Ct. at 517 (footnotes omitted).

■ A careful review of the development of the doctrine of unseaworthiness has led us to conclude that the issues of liability and comparative fault are distinct. Whether the condition of unseaworthiness existed is the first inquiry. To what extent, if any, the plaintiff's own negligence contributed to the creation of that unseaworthy condition is the second inquiry. The comparative fault of the plaintiff does not remove the condition of unseaworthiness, it only limits the amount of damages he may recover. This concept is clear in this case when one bears in mind that even if Cook's negligence had been the sole cause of the condition of unseaworthiness, if another seaman had been injured by the parting rope, such as Kirk Austin, he would have been able to recover from American Steamship for all of his damages resulting from that unseaworthy condition. Thus, even as to Cook, the ship would not become "seaworthy" simply because, in the hypothetical, Cook was the sole cause of its unseaworthiness. Continuing the hypothetical, even if the jury were to find that Cook was 100% at fault, the ship would be no less unseaworthy; Cook would simply recover no damage award.

■ This court, then, must first decide whether, as a matter of law, any reasonable juror could find that the BUFFALO had been seaworthy when Cook was injured. If no reasonable juror could so find, then the

district court erred when it declined to grant Cook's motion for judgment as a matter of law. The condition of unseaworthiness is a question of fact[3] and is generally not appropriately resolved as a question of law. This is necessarily so because the condition of unseaworthiness is predicated on the notion of reasonable fitness for the intended purpose.

■ There is no dispute that the line parted while being put to its intended use and that the parting was a proximate cause of Cook's injuries. American Steamship's defense is essentially that Cook's own negligence was the sole cause of the unseaworthy condition. It is not disputed that the line supporting the bos'n's chair parted when it was being utilized in the usual fashion for its intended purpose. We hold that no reasonable trier of fact could find that the BUFFALO had been seaworthy, and so Cook was entitled to judgment as a matter of law on this issue. This would be a moot point, as the jury did find the BUFFALO unseaworthy, except that we have concluded that the case must be retried on other grounds.

■ That a condition of unseaworthiness existed is only the first step of our inquiry. The more important issue, for this case at least, is comparative fault. Cook argues on appeal that there is no credible evidence to indicate that he was negligent. Having concluded that Timmons's expert testimony should not have been admitted, we must now ask whether any other evidence supports a finding that Cook was comparatively negligent. We conclude that, taking the evidence in the light most favorable to American Steamship and giving it the benefit of all reasonable inferences, as indeed we must, a reasonable trier of fact could have found that Cook's negligence contributed to the line's parting.

Don Pfohl, the American Steamship accident investigator, testified that during his telephone conversation with Captain Derry on the day of the accident, Derry told him the line had been burned. While this statement contradicts Derry's testimony, in the context of Cook's motion for judgment as a matter of law, we resolve credibility conflicts in American Steamship's favor. Also, Cook used a torch on the boom in the vicinity of the line. Tiny char marks were on the line where it had parted. Without the improper expert testimony of Timmons, American Steamship created a circumstantial showing, weak to be sure, that Cook had inadvertently burned the line and an equally weak showing that this inadvertent burning had contributed to the line's parting. Under the legal standard for judgment as a matter of law, however, we cannot say that the district court erred in denying Cook's motion.

### IV.

■ Cook's third assignment of error is that the district court allowed American Steamship to introduce evidence of Cook's alcohol abuse and his alcohol related ailments. We review a district court's relevancy rulings under Fed.R.Evid. 401 and its balancing of probativeness and substantial prejudice under Fed.R.Evid. 403 for abuse of discretion. *United States v. Bonds,* 12 F.3d 540, 554 (6th Cir.1993). However, where a party fails to object to the admission of evidence, Fed.R.Evid. 103(d) directs courts to take notice of plain errors that affect the substantial rights of a party. *United States v. Levy,* 904 F.2d 1026, 1030 (6th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991).

■ Cook argues that the district court erred by admitting evidence of Cook's prior drunk driving conviction, his teenaged experimentation with drugs, his past alcoholism, and his subsequent alcohol related liver ailments. Cook argues that this evidence is irrelevant under Fed.R.Evid. 401 and unfairly prejudicial under Fed.R.Evid. 403. Our careful reading of the record, however, indicates that Cook failed to object to the evidence and thus preserved all of these issues for appeal.

Cook made a motion *in limine,* asking the court to preclude American Steamship from

---

**3.** *Roper v. United States,* 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); *Dempsey v. Mac Towing, Inc.,* 876 F.2d 1538 (11th Cir.1989); *Jordan v.* *United States Lines, Inc.,* 738 F.2d 48 (1st Cir. 1984); and *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676 (10th Cir.1981).

introducing evidence of Cook's subsequent liver condition. Cook argued only that the evidence of his liver condition was not relevant and therefore inadmissible under Fed.R.Evid. 402. Cook made no mention of substantial unfair prejudice or Fed.R.Evid. 403.

■ The district court's initial ruling on the matter was that it would deny the motion without prejudice. The court preferred to hear the evidence and then deal with contemporaneous objections in their proper context. Cook has not shown that he objected to the offered testimony that he complains about on appeal. Our inquiry, then, is limited to deciding whether the district court abused its discretion by denying Cook's motion *in limine* without prejudice, and whether the admission of the testimony that Cook complains about was plain error.

■ Cook alleged that he was completely disabled solely because of the orthopedic injuries he suffered from falling to the dock. He alleged that, absent his orthopedic injuries, he would work to the age of 70 as a seaman. American Steamship responded that Cook's alcohol induced liver condition was the sole cause of his inability to return to work and would, in fact, drastically shorten Cook's life. Plainly, the evidence of Cook's alleged shortened life expectancy due to alcoholism was relevant and the court did not abuse its discretion in refusing *in limine* to exclude it. Likewise, it was not plain error to receive it.

Cook also assigns error to the district court's refusal to allow Cook's medical expert to testify that Cook's accident and orthopedic injuries caused his subsequent increased alcohol abuse and resulting liver condition. Prior to the district court's denial of Cook's motion *in limine* concerning the alcohol related ailments, Cook's counsel's position had consistently been that evidence of his client's alcohol related ailments was irrelevant to the case. The trial was originally set to begin on July 23, 1992, but at that time Cook was hospitalized with a serious alcohol induced liver condition that nearly took his life. Cook's counsel opposed efforts by American Steamship's counsel to obtain the hospital records and to have a new independent medical examination of Cook. On October 1, 1992, the district court granted American Steamship's motion for an independent medical examination. The trial began on February 22, 1993. After the district court denied Cook's motion *in limine*, Cook absented himself from the first day of trial so that he could consult with Dr. Stephen Newman, who was one of Cook's expert witnesses. At that time, Dr. Newman formed the opinion that Cook's alcohol related ailments were secondary to, that is, the result of, his orthopedic injuries. After American Steamship put on evidence of Cook's alcohol related ailments, Cook attempted to put in this testimony from Dr. Newman. The district court refused to allow in this evidence because it concluded that this was surprise evidence and American Steamship would be unfairly prejudiced by its introduction.

Because we have concluded that this case must be remanded for a new trial due to the erroneous admissions of witness Timmons's testimony, Cook will have the opportunity at that trial to timely present this evidence. We decline therefore to address the issue.

**V.**

In summary, then, we hold that the district court erred when it allowed Timmons to offer expert opinion testimony as to the cause of the line parting because the opinion was not the product of any expert testing and was not "scientific, technical, or other specialized knowledge" under Fed.R.Evid. 702. We also hold that the district court erred when it declined to grant Cook's motion for judgment as a matter of law on the issue of unseaworthiness, but did not err when it declined to grant the motion on the issue of comparative negligence. Finally, we hold that the district court did not err when it denied without prejudice Cook's motion *in limine* seeking to exclude evidence of his alcoholism as it relates to his life expectancy.

The judgment entered by the district court is **VACATED**, and the case is **REMANDED** for a new trial.