845 F.2d 356
 25 Fed. R. Evid. Serv. 413, Prod.Liab.Rep.(CCH)P 11,763
Escolastica DaSILVA, etc., et al., Plaintiffs, Appellees,
v.
AMERICAN BRANDS, INC., et al., Defendants, Appellees.
USM Corporation, Defendant, Appellant.
Escolastica DaSILVA, etc., et al., Plaintiffs, Appellees,
v.
AMERICAN BRANDS, INC., et al., Defendants, Appellees.
USM Corporation, Third-Party Plaintiff, Appellant.
 Nos. 87-1204, 87-1205.
 United States Court of Appeals,
First Circuit.
 Heard Oct. 7, 1987.
Decided April 21, 1988.
 
 Anil Madan with whom Rosann C. Madan, Faith A. LaSalle and Madan and Madan, Boston, Mass., were on briefs for defendant, appellant.
 Paul F. Leavis with whom Diane M. Meibaum and Connolly & Leavis, Boston, Mass., were on brief for Escolastica DaSilva.
 Thomas D. Burns with whom John J. McGivney, Darrell Mook and Burns & Levinson, Boston, Mass., were on brief for American Brands, Inc.
 Before COFFIN and TORRUELLA, Circuit Judges, and BROWN,* Senior Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 USM Corporation appeals from a jury determination in a wrongful death action that USM is liable to the estate and survivors of Richard DaSilva for two million dollars. Appellant also challenges the dismissal by the district court of its cross-claim for contribution from American Brands, Inc. (American). We affirm.
 
 
 2
 Mr. DaSilva was an operator of a Banbury mixer for Acushnet Company, a subsidiary of American. The Banbury is a large industrial machine manufactured by USM, used to mix ingredients for various types of rubber and plastic. Mr. DaSilva was found dead with his head and shoulders caught inside the hopper door of this machine. The jury concluded he was killed by the Banbury as a result of negligence and breach of implied warranty by USM. The principal argument of USM on appeal is that there was not enough evidence to support the jury's conclusions regarding causation. Because this is a challenge by a defendant to the sufficiency of the evidence, we must view the evidence in the light most favorable to the plaintiffs. Wallace Motor Sales v. American Motors Sales Corp., 780 F.2d 1049, 1055 (1st Cir.1985). We begin our analysis with a review of this evidence.
 
 
 3
 The mixing vessel of the Banbury is elevated so that the operator performs his duties on a raised platform, generally out of view of other workers. As part of his routine, the operator places ingredients into the machine through the hopper door, closes that door, and lowers a ram device which descends from the ceiling of the mixing chamber and exerts pressure on the batch to keep the ingredients fully involved with the rotors. The operator may open and close the door during mixing in order to add additional ingredients. When the mixing is complete, the operator rings a bell to inform the workers below that he is going to drop the batch through the drop door to the workers below for further processing. After the batch is dropped, the operator opens the hopper door, lifts the ram and, if necessary, scrapes the door and ram in order to remove residual materials. The scraping requires the operator to lean over the door somewhat. He may also lean over the door to verify that the batch cleared the rotors when dropped and to check that the rotors are clean.
 
 
 4
 The operator controls the machine from a control panel located near the hopper door. The hopper door is operated hydraulically, controlled by a lever situated in the control panel and approximately two and one half feet to the right of the door. When the lever is placed in the "close" position, the door normally shuts within one to two seconds. The door of the machine operated by DaSilva, however, occasionally stuck open; usually it then would be kicked shut by the operator.
 
 
 5
 On the night of January 10, 1983, Mr. DaSilva mixed his last batch of material. Following normal procedure, he then rang the bell and dropped the batch. After the workers had completed their tasks and vacated the working area, a fellow employee attempted to locate Mr. DaSilva because the latter had not shut down his station. The employee found Mr. DaSilva dead with his head, right arm, and chest inside the hopper door. The control lever for the door was in the closed position.
 
 
 6
 DaSilva's children and his wife, individually and as administratrix of his estate, brought a diversity action against American and USM for the wrongful death and conscious pain and suffering of the decedent. They alleged that Mr. DaSilva had sustained his injuries as a result of negligence and breach of implied warranty by USM in the design of the Banbury mixer. They initially further alleged that the accident occurred because of negligence by American in providing safety services and monitoring at its subsidiary. The latter claim was dismissed at the commencement of trial by stipulation of the parties and without monetary settlement. American remained a party, however, because USM filed a cross-claim seeking contribution.[1] The cross-claim alleged that American had assumed and negligently performed the duty to establish, perform, and monitor safety procedures for the Banbury mixer at Acushnet. The district court heard this claim separately, without a jury, and ruled in favor of American, finding that it had assumed no responsibility for Banbury safety.
 
 
 7
 USM was no more successful in its defense on the merits of the underlying suit. The jury returned a verdict finding USM liable for both breach of warranty and negligence in DaSilva's death. The breach of warranty verdict included a finding of two million dollars in damages.[2] The jury awarded no damages for pain and suffering by the decedent. In addition to its challenge to the sufficiency of the evidence regarding causation, appellant alleges that, at the jury trial, the court allowed incompetent and speculative evidence; that the court gave improper instructions regarding the relevant time of defect in the Banbury; and that the damages awarded by the jury were excessive as a matter of law.[3] Appellant also argues that, during the bench trial on USM's claim for contribution, the district court applied the wrong law and made clearly erroneous findings of fact. We consider separately below the allegations of error at the jury and bench trials.
 
 JURY TRIAL
 Sufficiency of the Evidence
 
 8
 When assessing the sufficiency of the evidence, the role of this court is to determine "whether, viewing the evidence in the light most favorable to the plaintiffs, there was any combination of circumstances from which a rational inference may have been drawn in favor of the plaintiff." DeMedeiros v. Koehring Co., 709 F.2d 734 (1st Cir.1983). We believe that the inferences drawn by the jury were rational.
 
 
 9
 Plaintiffs-appellees state that the "only probable cause" of the accident was the following scenario: (1) DaSilva placed the hopper door switch in the closed position; (2) the door did not close because it was stuck; (3) DaSilva did not notice the door had not closed; (4) he later leaned on and over the door to inspect or clean, forgetting that the switch was in the closed position; (5) his weight on the door caused it to unstick; and (6) the door then closed rapidly and crushed him to death. We will not disturb the jury's findings on the basis of the causation issue if there was evidence by which a rational juror could have determined that each of these events occurred.
 
 
 10
 The evidence clearly supported a finding that DaSilva placed the switch in the closed position. There was testimony that normally the operator would be alone on the platform, that DaSilva was the operator and was alone on the night the accident happened, and that it was the operator who handles the door control mechanism. This is sufficient evidence for the jury to conclude that it was DaSilva who placed the lever in the closed position.
 
 
 11
 Secondly, there was uncontested testimony that the hopper door of this particular machine frequently stuck. It was not necessary, as appellant contends, for the plaintiff to introduce specific evidence that the door stuck on this occasion. The jury could infer, because the door had stuck on previous occasions, that it had also stuck just prior to DaSilva's death.
 
 
 12
 There was also sufficient evidence by which the jury could have concluded that DaSilva did not notice the door had not closed. They could have come to this conclusion on the basis of testimony that the operator's job was "very busy," involving numerous tasks which had to be accomplished quickly during and after the mixing operation. These tasks often included opening and closing the hopper door to add ingredients while the batch was mixing. From evidence of such an environment, it would be reasonable to conclude that DaSilva opened the door, added ingredients, put the lever in the closed position, but then was distracted as he moved onto the next task, not noticing the door had failed to close and forgetting that he had put the lever in the closed position by the time he returned his attention to the door.
 
 
 13
 There was rather extensive evidence that an operator was required to "look over the door" or to "look into the machine" after completion of a batch. In particular, it was common practice for an operator to check whether a batch had completely cleared the rotors after the operator had opened the drop door to drop the batch. A jury justifiably could conclude that DaSilva had looked over the door and into the machine after he had dropped his last batch. Similarly, the jury could have inferred that DaSilva leaned on the door while checking the inside of the machine.
 
 
 14
 Another Banbury operator testified that on a previous occasion his arm was trapped by the suddenly closing hopper door when, after putting the control lever in the close position and failing to notice that the door had not closed, he had leaned into the machine and perhaps "brushed up against the door." This testimony substantiated the above inferences and suggested the weight of a man could cause a stuck door to break loose and suddenly close.
 
 
 15
 There is little doubt that the sudden closing of the door could have trapped and killed DaSilva. The evidence indicated that the door closed within a period of time sufficiently short to make it unlikely that one leaning into the hopper would be able to avoid being trapped. The plaintiffs also presented medical testimony that DaSilva died of asphyxiation caused by compression of his neck and chest by the hopper door.
 
 
 16
 Finally, considerable expert testimony presented at trial described alternative designs which were technically feasible at the time the Banbury was built and which would have prevented the above scenario from occurring. For example, USM could have incorporated a two handed switch which would require an operator to hold two controls in the "close" position in order to close the hopper door; with such a design, the door could only close if the controls were held in the close position, thus eliminating the possibility that an operator could be over the door when it shut.
 
 
 17
 Plaintiffs therefore presented sufficient evidence to support a coherent theory of causation which could lead a reasonable jury to conclude USM was liable. While the theory relied heavily on inference drawn from evidence of habit and past occurrences, we do not believe the inferences were unreasonable. Neither do we find greater credibility in appellant's alternative theories which are generally based on suggestions of foul play. In particular, except for some possibly unexplained bruises found on DaSilva's head, we find virtually no evidence in the record to support appellant's hypothetical that someone may have killed DaSilva, placed him in the hopper door, and then closed it on him.
 
 Expert Testimony
 
 18
 Opinion testimony was presented at trial under Federal Rules of Evidence 702 and 703. These rules allow an expert to present scientific or technical testimony in the form of opinion based on facts or data perceived or made known to the expert before or at trial. USM challenges the admission at trial of opinion testimony by experts regarding cause of death and potential safety features which USM could have incorporated into the design of the Banbury.
 
 
 19
 Dr. Robbins, a medical doctor, testified for the plaintiffs that, in his opinion, DaSilva died of asphyxiation caused when the hopper door of the Banbury closed with great force across his neck and chest. At no time did he equivocate as to this conclusion regarding cause of death. He did, however, indicate that he could not fully explain the origin of certain cuts and bruises suffered by DaSilva. USM claims the court erred by nonetheless allowing him to testify regarding his "beliefs" as to how these injuries occurred. Appellant claims that the use by Dr. Robbins of the words "my belief" or "could have" demonstrates that this expert was impermissibly speculating.
 
 
 20
 The record does not support this contention. Dr. Robbins was subjected to extensive, exhaustive and, at times, quite antagonistic cross-examination. While at times he did not choose the precisely proper wording for his responses, those responses generally reflected a conclusion based on a reasonable degree of medical certainty. As an expert, he was not required to fully explain with certainty the origin of every injury suffered by the victim. Rather, he could express his conclusions in terms of reasonable probabilities, based on his expertise applied to the facts available to him.
 
 
 21
 USM also attacks the qualifications and testimony of Holt, a mechanical engineer and witness who gave his expert opinion regarding the safety design of the machine. It argues that the court should not have allowed Holt to testify since he had no design experience with this particular machine and his only prior exposure to it was briefly as a production line supervisor. Appellant, in essence, is arguing that we should constrain a trial court to admit testimony only from mechanical engineers who have had design experience with the specific machine in question. Such an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending its design. We therefore are not persuaded to abandon the general rule that a court should consider all relevant qualifications when ruling on the admissibility of expert testimony. Nor do we wish to place unnecessary constraints on the discretion of the trial court. "Whether a witness is qualified to express an opinion is a matter left to the sound discretion of the trial judge. In the absence of clear error, as a matter of law, the trial judge's decision will not be reversed." McDonald v. Federal Laboratories, Inc., 724 F.2d 243, 248 (1st Cir.1984) (quoting A. Belanger & Sons, Inc. v. United States for Use and Benefit of National United States Radiator Corp., 275 F.2d 372, 376 (1st Cir.1960)). We therefore hold that the court below properly exercised its discretion when it admitted the testimony of Mr. Holt after it was shown that he had twenty-three years of experience as an engineer, he was familiar with fundamental engineering principles of machine design, he had extensive experience evaluating and recommending safety devices for machines, and he was familiar from prior experience with the operation of the Banbury.[4]
 
 Jury Instructions
 
 22
 The trial court instructed the jury to determine whether the Banbury was defective at the time of the accident rather than at the time the machine left USM's factory. We agree with appellant that, under the facts of this case, the applicable Massachusetts law requires the jury to consider whether the defect in the machine existed at the time it left the manufacturer. Smith v. Ariens Co., 375 Mass. 620, 377 N.E.2d 954, 958 (1978). However, no evidence was presented at trial that the Banbury at Acushnet had been modified, since it had been purchased, in any way which could have made DaSilva's accident more likely. In particular, the function and design of the hopper door and its control switch were virtually identical at the time of the accident to when the machine was purchased. The error in the jury instruction regarding relevant time of defect was therefore harmless.[5]
 
 Damages
 
 23
 When reviewing a jury's damage award, we are limited to determining whether the trial court abused its discretion in refusing to set aside the judgment as excessive. Coy v. Simpson Marine Safety Equipment, Inc., 787 F.2d 19, 27 (1st Cir.1986). We should not set aside the award unless, viewing the evidence in the light most favorable to the plaintiff, the verdict was " 'grossly excessive,' 'inordinate,' 'shocking to the conscience,' or 'so high that it would be a denial of justice to permit it to stand.' " Id. (quoting McDonald v. Federal Laboratories, Inc., 724 F.2d 243, 246 (1st Cir.1984)).
 
 
 24
 Pursuant to the Massachusetts Wrongful Death Statute, a plaintiff in a wrongful death action may recover for funeral expenses, for the reasonably expected net income of the decedent, and for the value of "services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent...." Mass.Gen.Laws Ann. ch. 229, Sec. 2 (West 1986). Damages, however, should not be awarded for "grief, anguish [or] bereavement of the survivors." MacCuish v. Volkswagenwerk A.G., 22 Mass.App. 380, 494 N.E.2d 390, 398-99 (1986), aff'd, 400 Mass. 1003, 508 N.E.2d 842 (1987); see also Laaperi v. Sears, Roebuck & Co., Inc., 787 F.2d 726 (1st Cir.1986) (jury not permitted to award compensation for grief and mental suffering).
 
 
 25
 The evidence at trial on the issue of damages was essentially undisputed. At the time of his death, DaSilva was 28 years old and earning $280 per week. He had a wife and three children, ages one, two, and four. The family at that time lived with one of Mrs. DaSilva's sisters and her mother on the third floor of a three tenement house. Mrs. DaSilva worked from 7:30 AM to 3:30 PM, thus allowing her husband, who worked a 2:00 PM to 10:00 PM shift, to be able to take care of the children during most of the time she was away from the home. She earned $140 per week. Mrs. DaSilva's uncontested testimony indicated that Mr. DaSilva was a loving and devoted husband and father who spent a great deal of his free time with his family.
 
 
 26
 Based on Mr. DaSilva's age, life expectancy, and earning potential, plaintiffs argued, apparently without contest, that the value of his life earnings had he worked until retirement would have been $540,000.[6] The cost of support of Mr. DaSilva himself, had he lived, was not considered. Burial expenses were $17,500. According to Mrs. DaSilva, she had to quit her job after her husband's death in order to look after the children during the day. She also testified that as of the date of the trial, four years after her husband's death, the family no longer celebrated birthdays or holidays.
 
 
 27
 Since the jury awarded two million dollars to the plaintiffs, the above figures indicate that approximately 1.5 million dollars were awarded for loss of "services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice." While we agree that the Massachusetts Wrongful Death Statute is quite vague as to allowable damages, the computation of such damages is well-suited for "the judgment of the fact-finding tribunal in appraising the deprivations and 'translating them into a compensatory sum.' " MacCuish, 494 N.E.2d at 401. In light of the fact that Mrs. DaSilva and her three children can reasonably be expected to endure their losses for over forty years, we must conclude that the jury's award was neither "shocking to the conscience" nor "grossly excessive."
 
 Bench Trial
 
 28
 Regarding its claim for contribution from American, USM first argues that the district court misunderstood the applicable law by ruling that liability attaches to a parent only when it assumes complete responsibility for safety at a subsidiary. From our reading of the trial record, we cannot agree that this was the legal principle applied by the court.
 
 
 29
 Our understanding of the district court's reasoning is as follows. The court first noted that under Massachusetts law, American is not liable for the acts of Acushnet, DaSilva's former employer, merely on the basis of their relationship as parent and subsidiary. The court then applied the standard urged by USM, as expressed by this court in Muniz v. National Can Corp., 737 F.2d 145 (1st Cir.1984), and based on the Restatement (Second) of Torts Sec. 324A (1965). The court correctly reasoned that, even under the Muniz standard, American was not liable because there was no credible evidence that American assumed responsibility for safety at Acushnet or that Acushnet relied on its parent to lessen its responsibilities for plant safety in general, and for the Banbury in particular.
 
 
 30
 The court did not rest its decision solely on this finding and went further, due to its doubts as to whether Muniz was directly applicable to this suit under Massachusetts law. It thus ruled in the alternative that American was not liable under the "independent contractor" standard which it found to be the more appropriate standard under Massachusetts law, and which, the court reasoned, extends liability to the extent that the "independent contractor" provides services for which it charges a fee. The court determined that the fee charged by American to Acushnet was only for brief inspections, for designing and suggesting general safety procedures, and for checking compliance with OSHA regulations. It specifically found that American assumed no duty to discover or correct any defect with the Banbury.
 
 
 31
 Nowhere in the record do we see any indication by the court, in its analysis under either of these standards, that it would find American liable only if the court determined that American had assumed complete responsibility for safety at Acushnet. As a result, we find that USM asserts an incorrect interpretation of the district court's definition and application of the challenged legal standard. We therefore conclude that the argument on this issue it advances before this court is without merit.[7]
 
 
 32
 USM also argues that the court based its judgment on four clearly erroneous findings of fact. The challenged findings are (1) American was motivated by tax considerations in the allocation of charges to its subsidiaries for safety-related services; (2) American allowed Acushnet to abandon an accident prevention system proposed by American because of the burden of trying to encourage all of its subsidiaries to implement the program; (3) American's duty was limited to "checking for compliance with previous [safety] recommendations ... made by Liberty Mutual [an insurance company] and by American Brands' own safety inspectors ..."; and (4) American provided only general safety guidelines and none specifically directed at the Banbury.
 
 
 33
 None of these findings is an error requiring retrial. While we doubt that the first two findings were wrong, we fail to see, and USM does not indicate, how these findings would have been prejudicial to its case even if they were erroneous. Regarding the third alleged factual error, we have reviewed the record and conclude that the challenged statement made by the judge has been taken out of context by appellant. During the course of his statement of findings, the judge indicated that American had assumed duties "[f]or brief and cursory inspections; for the designing and suggesting of general safety procedures; and for the rather routine checking of compliance with OSHA regulations." The challenged statement of the judge was an additional finding regarding American's duties and only characterized those individuals whose recommendations created in American a duty to investigate further and to correct any problems thereby identified. Finally, USM has identified nothing in the record which contradicts a finding that American did not provide specific safety guidelines for the Banbury.[8]
 
 
 34
 Affirmed.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 USM also initially sought indemnity from American but that claim was dismissed by the court at the commencement of trial. That dismissal has not been challenged
 
 
 [2]
 The jury's verdict on the negligence claim included damages of 1.5 million dollars, thus indicating that it found DaSilva's comparative negligence to have been twenty-five percent responsible for his death. The amount of this award, however, is irrelevant since only the largest of the two verdicts was awarded. The jury was aware when it began deliberations that this would occur
 
 
 [3]
 USM also claims that a new trial should have been ordered because the jury's failure to award damages for pain and suffering is inconsistent with finding USM liable, and because the fact that DaSilva placed his head inside the machine requires a finding of knowing misuse. We have considered these arguments and find them to be without merit. We also reject, as against clearly established Massachusetts law, appellant's argument that the jury's finding of comparative negligence on the part of DaSilva necessarily means that he knowingly misused the machine. See Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 446 N.E.2d 1033, 1039-41 (1983)
 
 
 [4]
 USM's related charge that Holt's opinions were not based on facts in evidence is not supported by the trial record
 
 
 [5]
 USM's other claims of error in the jury instructions are assertions that the judge implied that certain conclusions could be drawn which were not supported by any evidence. Our review of the record indicates, on the contrary, that evidence had been introduced to support these conclusions
 
 
 [6]
 This calculation was quite crude in that it simply represents the total amount DaSilva would have earned had he worked at the same salary for his entire career and thus ignores inflation on the one hand, and increased earning potential on the other
 
 
 [7]
 Appellant makes related arguments under the heading of its challenge to the legal standard but which are, in essence, a challenge to factual findings by the lower court regarding the extent to which American assumed any responsibility for safety at Acushnet. A review of the record strongly supports the court's findings in this matter. We leave those findings undisturbed
 
 
 [8]
 USM also alleges that the district court erred by denying USM's motion to alter or amend the judgment, conclusion, and findings in twenty-nine different ways. The record shows that the court's refusal to accept these suggestions was proper