David WELLMAN, Plaintiff,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.

No. C2–98–476.

United States District Court, S.D. Ohio, Eastern Division.

April 7, 2000.

Thomas C. Wood, Jr., Columbus, OH, for plaintiff.

Patrick J. Smith, (Porter, Wright, Morris & Arthur,) David W. Orlandini, (Isaac, Brant, Ledman & Teetor), Columbus, OH, for defendant.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Motion in Limine (Doc. 19) filed by the Defendant, Norfolk and Western Railway Company ("N & W") regarding the testimony of Walter C. Rockey, an expert listed by the Plaintiff as a witness to be called at trial. N & W contends that Rockey's testimony should be excluded pursuant to Fed.R.Evid. 702

and the standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

## I.

In advance of trial, this Court held a hearing on the motion on April 5, 2000. Prior to the hearing, Plaintiff agreed that he would not offer the testimony of Mr. Rockey regarding any rules, regulations or standards promulgated by the Occupational Safety and Health Administration ("OSHA"). Based on such representation, this portion of the Defendant's motion is denied as moot, provided that Plaintiff shall not offer any testimony through Mr. Rockey concerning OSHA regulations, rules or standards.

This case involves a claim by the Plaintiff that the Defendant was negligent in permitting soybeans and scrap metal shavings to accumulate between the rails of a train track. The Plaintiff contends that while he was working on air hoses extending between railroad cars, he stepped between the rails of the track and slipped on the scrap metal and soybeans, causing injury to his right knee and back. He also contends that the Defendant was negligent by failing to maintain a safe and suitable place to work by allowing such debris to accumulate.

From the report submitted by Mr. Rockey and the testimony given during the hearing, it is the intention of the Plaintiff to offer his testimony and opinion to establish the following:

1. Deposits of soybeans in and around railroad tracks are hazardous;

2. Deposits of metal shavings in and around railroad tracks are hazardous.

3. If rail cars are properly loaded, metal shavings and soybeans would not be deposited upon the tracks.

4. If the bottoms of gondolas and hoppers were properly closed, and the cars were properly loaded, soybeans and metal shavings would not be deposited along the rail line.

5. Railroad crews should inspect gondolas and hoppers before transporting to insure that the cars are properly loaded to prevent spillage along the rail lines.

6. If gondolas are overloaded, a railroad carrier should not accept such car in a condition that would make spills likely.

Walter C. Rockey has an extensive work history involving the railroad industry. In 1956, he began work for the Pennsylvania Railroad as a trackman and completed approximately twenty-four and a half years of service with the company. In addition to working as a trackman, he worked as a clerk, locomotive operator/trainman, transportation apprentice, yardmaster, assistant trainmaster, trainmaster, terminal superintendent and senior operations planning engineer. Most pertinent to his testimony in this case, his work as a yardmaster, assistant trainmaster, trainmaster and terminal superintendent involved managerial responsibilities including supervision of yard freight, terminal facilities, main track operations, the employee assignments, and track operations.

Mr. Rockey left the employment of what was then the Penn Central Railroad, in 1971, and began a twenty-six year term of employment with the Federal Railroad Administration ("FRA"). Mr. Rockey was first employed as a safety inspector and participated in the administration of FRA safety regulations concerning the transportation of hazardous material by rail carriers. From 1972 to 1974, he was employed as a rail accident analyst. He thereafter served in a number of positions with the FRA, including program analyst, regional director, director of state assistance. In his last position as executive assistant, he was involved with the development and implementation of a national safety program.

During his testimony, Mr. Rockey admitted that he had not visited the Watkins Yard where the alleged injury sustained

by the Plaintiff occurred. He did not observe the cars which may have dumped soybeans or scrap metal on the track and cannot discern whether a leaky door or an overloaded car caused the spill. He performed no tests on hopper or gondola doors. He has no knowledge as to how long the debris was on the track prior to the alleged accident. He also does not know the identity of the railroad which owned the cars which could have caused the debris to be deposited upon the track.

## II. Daubert Standard

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the "general acceptance" test of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) had been superseded by the Federal Rules of Evidence, and that Rule 702 requires that trial judges perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Recently, the Supreme Court made clear that Rule 702 applies not only to scientific testimony but also to other types of expert testimony based on technical or other specialized knowledge. See *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ The trial court's gatekeeping role is two-fold. First, the Court must determine whether the proffered testimony is reliable. See *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief. *Id.* Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3rd Cir.1994). The Supreme Court in *Daubert* set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable. They are:

> (1) whether the theory or technique has been tested;

> (2) whether the theory or technique has been subjected to peer review and publication;

> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

> (4) whether the theory or method has been generally accepted by the scientific community.

*Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. The Court in *Kumho Tire* stressed that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability. *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167. The test of reliability is a "flexible" one, however, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *Id.,* quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786.

■ The particular factors will depend upon the unique circumstances of the expert testimony involved. See *Kumho Tire Co.,* 526 U.S. at 151–52, 119 S.Ct. 1167. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153, 119 S.Ct. 1167. The Court noted:

In other cases, the relevant reliability concerns may focus upon personal knowledge or experience. As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise. *See Brief for United States as Amicus Curiae,* 18–19 n.5 (citing cases involving experts in drug terms, hand-writing analysis, criminal modus operandi, land valuation, agricultural practices, railroad procedures, attorney's fee valuation, and others) . . . We agree with the Solicitor General that "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Brief for United States as Amicus Curiae,* 19. The conclusion in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category or expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

*Id.* at 150, 119 S.Ct. 1167.

■ The second prong of the gatekeeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, that is, whether the opinion is relevant to the facts at issue. See *Daubert,* 509 U.S. at 591–93, 113 S.Ct. 2786. This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. See *United States v. Bonds,* 12 F.3d 540, 555 (6th Cir.1993). Thus, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant. . . ." *Kumho Tire Co. Ltd.,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

■ The United States Supreme Court and other Circuit Courts of Appeal have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise, or that are not founded on a reliable methodology. See, *e.g., Kumho Tire Co., Ltd.,* 526 U.S. at 154–55, 119 S.Ct. 1167 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram v. Marley Company,* 169 F.3d 514, 518 (8th Cir.1999) (holding that a city fire captain, although qualified as an expert on fire investigation, and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to a sofa, was not qualified to testify as to his unsubstantiated theories of a malfunction that might have caused the fire); *Allison v. McGhan Medical Corp.,* 184 F.3d 1300 (11th Cir.1999) (proposed expert testimony of pathologist not permitted upon basis of unreliable methodologies in silicon breast implant case); *Cummins v. Lyle Indus.,* 93 F.3d 362, 371 (7th Cir. 1996) (industrial engineer not permitted to render an expert opinion regarding the adequacy of warnings, the adequacy of an instruction manual, and the feasibility of alternative designs for a trim press). The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value.

### III.

■ The Court now turns to its gatekeeping function to determine whether the proffered testimony of Walter Rockey is reliable, whether the reasoning is scientifically valid, and whether it is based upon more than unsupported speculation or sub-

jective belief. As explained in *Kumho Tire,* the *Daubert* factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co., Ltd.* 526 U.S. at 151. The Supreme Court summarized the purpose of *Daubert's* gatekeeping requirement as follows:

> [It] is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field .... [W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether the particular expert testimony is reliable. *Id.* at 152, 119 S.Ct. 1167.

█ In this case, the proffered expert, Walter C. Rockey, is not a scientist, nor is he an engineer. He does, however, have extensive experience in the railroad industry, as an employee, supervisor and government inspector. His proposed testimony is not based upon scientific evidence, is not subject to the traditional definition of peer review, and is not based upon verifiable and repeatable tests. Nonetheless, as *Kumho Tire* makes clear, the four-part *Daubert* test is flexible and is in no way a definitive checklist which must be met before the trial court, as gatekeeper, may admit the testimony.

The issues about which the expert proposes to testify concern the proper and safe maintenance of a railroad yard with respect to debris dropped from loaded cars. The Plaintiff bears the burden of establishing that the railway was in some way negligent in failing to maintain a safe workplace. The calculus of risk incumbent in an analysis of negligence in this context turns on a number of factors, including, but not limited to: a) methods of preventing or detecting debris; b) the amount of debris which will make a railway unsafe for workers; c) means of inspecting cars to prevent spills; and d) practices and proce-

dures in place to remediate spills in a timely manner. While this list is not meant to be exhaustive, it is designed to illustrate the types of issues which the Plaintiff must establish to prove that the Defendant employer maintained an unsafe rail line and that the same constituted negligence.

In the Court's view, Walter Rockey has sufficient expertise and experience in the rail industry to opine as to these issues. He is qualified to testify as to the proper maintenance of a rail line with respect to accumulation of debris, the means of detecting and remediating such spills, methods of preventing incoming cars from causing debris, and acceptable industry methods to remediate such hazards. To the extent that he has worked in the industry, particularly as a former terminal superintendent, trainmaster, and yardmaster for the Penn Central Railroad and his later experience in the regulation and oversite of the industry by the FRA, he is qualified to render such opinions.

█ The Court is concerned that Mr. Rockey's qualifications and expertise not be brought to bear on issues which are not, at the core, dependent on special knowledge or training to ascertain. The Defendant has correctly argued that the witness may not give expert opinions which simply verify issues of fact about which lay witnesses will testify. For example, the witness may not give an opinion as to whether soybean droppings and metal shavings created slippery conditions. The Court assumes that there will be lay testimony on this point. The Plaintiff himself, or other coworkers, may testify on this matter and the subject is not one within the specific expertise of an expert in general, and Mr. Rockey in particular.

█ In addition, based upon the testimony given by the witness, Mr. Rockey will not be permitted to testify as to the method by which the soybeans and metal shavings accumulated on the track. He was, of course, not an eyewitness to the

events. He has identified at least several different possibilities as to how the debris accumulated. He has no particular expertise in the loading of a hopper or gondola. He may, however, testify based upon his experience as a yardmaster, terminal superintendent and trainmaster as to whether the Defendant should have anticipated a certain amount of spillage and what steps to inspect, detect or remediate should have been in place.

The Defendant has correctly noted that this witness has not been to the Watkins Yard and has no knowledge as to the ownership of any gondolas or hoppers which may have caused the spills in question. All of these matters are issues which may be presented to the jury in the course of cross-examination. At the same time, the Court is concerned that the dilemma described by the Court in *DaSilva v. American Brands, Inc.*, 845 F.2d 356, 361 (1st Cir.1988) not be the upshot of the *Daubert* and *Kumho* decisions. In *DaSilva*, the Court rejected the notion that a mechanical engineer could not render an opinion on the safety design of a machine because he had no design experience with such equipment. In the Court of Appeals' view, under this formulation, "the only experts who could testify regarding a machine are those who have an interest in defending its design." *Id.* at 361.

The Defendants have also directed the Court's attention to two recent decisions of the Court of Appeals for the Sixth Circuit in the aftermath of *Daubert*. In both cases, *Cook v. American Steamship Co.*, 53 F.3d 733 (6th Cir.1995) and *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir.1997), the Court of Appeals held that the experts offered on behalf of the plaintiff did not meet the standards under Fed.R.Evid. 702 or *Daubert*[1] In *Smelser*, an employee had been injured while operating a pickup truck owned by his employer. Under the plaintiff's theory of the case, the employer negligently failed to maintain the shoulder belt of the company truck which caused plaintiff's back injuries and aggravated preexisting neck injuries. The same pickup truck had been involved in an accident two months earlier in June 1989, at which time, according to plaintiff, the shoulder harness was damaged. According to the plaintiff's theory, because the shoulder harness was damaged in June, in the August 1989 accident, he was injured although the lap belt was intact, while the shoulder harness was malfunctioning.

At trial, Smelser called a Dr. Ronald Huston, a biomechanical engineer. Dr. Huston examined the safety belt more than two and one-half years after the August 29, 1989 accident. He performed no tests to determine if the lap or shoulder belt had been damaged from the previous accident of June 1989 or were caused instead by the later accident in August of the same year. Nonetheless, he testified that the marks on the shoulder belt were caused by the force exerted in the June 1989 accident. Further, in November 1993, Dr. Huston tested the retractor assembly of the shoulder belt and took measurements on a limited number of occasions. He admitted during his testimony that the test results would be inaccurate if the mounting plate was not at zero degrees. He also testified that he did not inspect the vehicle to determine the precise degree of the mounting plate. Further, while he testified that he performed the test "about a hundred times," he took measurements on only five or six occasions. *Id.* at 304.

The Court of Appeals concluded that Dr. Huston's testimony was not based upon scientifically valid principles. First, Dr. Huston failed to perform any tests on the

---

**1.** In both of these cases, the Court of Appeals applied a *de novo* review standard as to the admissibility of expert testimony. This standard was later rejected by the Supreme Court in *General Electric v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Consequently, both of the two cases cited by the Defendant are essentially reversed on other grounds which do not effect the principles cited to the Court by the Defendant.

lap belt. Second, he performed no testing to verify his conclusions to the effect that the shoulder belt was damaged in the 1989 accident. Third, he made no documentation as to testing conditions and did not measure a rate of error. Fourth, he failed to discover or consider the degree of mounting in the subject vehicle.

Additionally, Smelser rendered what in essence were medical opinions, far beyond his field of expertise in biomechanics. In addition to describing the mechanics of injury, he also testified as to specific medical causation, despite the fact that he was not a physician. The Court also noted that he did not have a full history as to Smelser's previous injuries, he did not consider the fact that Smelser had a previous neck injury with regard to the prior accident of June 1989 and he had not discussed Smelser's symptoms with him regarding both accidents. From all of the above, the Court of Appeals concluded that Smelser's testimony should have been excluded.

Similar scientific shortcomings were noted by the Sixth Circuit in *Cook v. American Steamship Co., supra.* At issue in that case was the condition of a certain three-quarter inch diameter manila rope. While working under inclement weather with a blow torch, the plaintiff fell a considerable distance after the rope line broke. The plaintiff contended that the rope line was defective and unsafe. The defendant asserted that the plaintiff's own blow torch caused the severing of the rope.

The plaintiff called as an expert one Michael Timmons, who had been employed by the Buffalo Testing Laboratories and had tested various products to determine capacity to withstand stress. The testimony given by Timmons was riddled with mistakes, including the fact that he incorrectly believed that a thirteen foot section of line which he sent out for testing had been taken from the line that had severed. Instead, only at trial did he learn that the rope which had been tested had been sent only for that purpose. Further, Timmons also applied the flame of a torch to a rope which he brought with him to trial. The rope did not have the same diameter as the rope in question. No testimony was offered that the torch used by Timmons was similar to the one that the plaintiff had used prior to the time of injury.

The Sixth Circuit concluded that Mr. Timmons' testimony was not based upon scientific, technical or other specialized knowledge as required by Fed.R.Evid. 702. In particular, the Court concluded that his causation opinion was not based upon science even though it was "adorned ... in the dress of scientific or technical expertise...." *Id.* at 739. The Court was particularly critical of the fact that such testimony was described by the trial court as "expert opinion" when the same was not based upon scientifically valid principles.

In this Court's view, neither *Smelser* nor *Cook* require exclusion of Rockey's testimony. In both *Smelser* and *Cook*, to a great extent the testimony offered by the experts was beyond the specialized knowledge or training possessed by such witness. Such is not the case with the proffered testimony of Rockey. Further, the methodology used by the witnesses in *Smelser* and *Cook* was seriously flawed or incomplete. Both attempted to rely upon tests which were not scientifically performed, not subject to peer review through additional testing, and not based upon sound scientific principles. In this case, Rockey does not intend to offer tests but instead will draw upon his experience and specialized knowledge of the railroad industry. To this extent, he is not being offered, as was apparently the case in *Cook*, to wrap his reported expert testimony around either unsupported conclusions or prohibited, non-expert opinions.

For these reasons, the Court will permit, with the limitations noted above, the testimony of Walter Rockey. The Court directs counsel for Plaintiff to advise Mr. Rockey of the limitations contained in this Order to insure that his testimony will be limited to the areas herein described.

## IV.

Based upon the foregoing, the Defendant's Motion in Limine with regard to the testimony of Walter Rockey (Doc. 19) is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**