**Sandra MILLER, individually and as executrix of Ralph Miller's estate, Plaintiff–Appellant,**

v.

**UNIROYAL TECHNOLOGY CORPORATION, doing business as Uniroyal Engineered Products, and Emhart Industries, Inc., Defendants–Appellees,**

No. 00–4559.

United States Court of Appeals, Sixth Circuit.

May 22, 2002.

Before MERRITT, SUHRHEINRICH, and GILMAN, Circuit Judges.

## OPINION

GILMAN, Circuit Judge.

Ralph Miller (Miller) was crushed to death by an industrial mixer while performing a maintenance procedure during the course of his employment with Uniroyal Technology Corporation (Uniroyal). His widow, Sandra Miller, subsequently brought a wrongful death suit in state court, asserting an intentional tort claim against Uniroyal and a products liability claim against Emhart Industries, Inc. (Emhart), the successor-in-interest to the manufacturer of the mixer. After removing the case to federal district court, both Uniroyal and Emhart filed motions for summary judgment. The district court granted the motions. For the reasons set forth below, we AFFIRM the judgment of the district court.

## I. BACKGROUND

### A. Factual background

Miller began working at Uniroyal's Port Clinton, Ohio facility in 1968. He was working as a "maintenance mechanic" at the time of his death in February of 1997. A maintenance mechanic at the Uniroyal facility performs various cleaning procedures on the equipment, including two large industrial mixers. Miller died while cleaning one of those mixers, referred to as the Banbury Mixer #1. This mixer was manufactured in 1966 by the Farrell Company, now known as Emhart. Uniroyal purchased the mixer that same year.

The Banbury Mixer #1 is designed to turn raw materials into plastic and rubber. It stands three stories tall, with each story housing one of the mixer's main components. The upper level consists of the hopper, in which raw materials are loaded for mixing. Hydraulic pumps that mix the raw materials are located in the intermediate level of the mixer. The lower level provides a holding area for the mixed material and contains a drop door through which the material falls onto a conveyor belt for further processing. A control panel located on the upper level contains all of the instruments necessary to operate the mixer, including the levers that open and close both the hopper door and the drop door.

On the morning of February 2, 1997, Miller received a work order to perform the "dust-stop flushing procedure" on the Banbury Mixer #1. This procedure, which Miller had performed on 11 prior occasions, cleans the internal components of the mixer by draining contaminants from prior batches of mixed material into a lined box placed underneath the drop door. The mixer must be operated during the procedure, but no materials are loaded into the hopper.

Shortly after he began the procedure on the date in question, Miller was found with his head, left shoulder, and left arm pinned by the hopper door, a 30-inch square steel

plate that is 2.5–inches thick. This door, which is controlled by powerful pneumatic air pressure, is hinged at the bottom so that it operates like a flap, swinging up when closed and down when opened. The door had swung toward the closed position while Miller was in the hopper-door opening, with the impact of the door causing his death. Employees who came upon the scene ascertained that Miller was dead and, once the air pressure to the hopper door was shut off, removed him from the opening to the hopper.

## B. Procedural background

Sandra Miller, both individually and on behalf of her husband's estate, brought suit against Uniroyal and Emhart in March of 1999. Suing in state court, Sandra Miller sought to recover under Ohio's wrongful death statute, which is codified at § 2125.02 of the Ohio Revised Code. She claimed that Uniroyal bore responsibility for Miller's death because it allegedly required him to service the Banbury Mixer # 1 despite knowing that the hopper door was substantially certain to cause serious injury or death. By so alleging, she sought to avoid the limitations on recovery imposed by Ohio's workers' compensation system. Ohio Rev.Code § 4123.741. Sandra Miller also maintained that Emhart contributed to Miller's death by allegedly designing the mixer in a defective manner and failing to warn users of the dangers associated with the hopper door. In addition to suing for wrongful death, she asserted an individual claim for loss of consortium.

Pursuant to 28 U.S.C. § 1332, Uniroyal and Emhart removed the case to federal district court on the basis of diversity of citizenship. They then filed motions for summary judgment, which the district court granted. The district court reasoned that because Uniroyal never required Mil-

ler to place his body inside of the hopper-door opening when performing the dust-stop flushing procedure, Uniroyal was not liable for Miller's death beyond the provisions of Ohio's workers' compensation system. Furthermore, the court concluded that Sandra Miller had failed to show that either a defect in the design of the mixer or the lack of a warning with regard to the operation of the hopper door had proximately caused the accident, thus relieving Emhart of any liability for Miller's death.

This timely appeal followed. After filing her appeal, Sandra Miller settled her dispute with Uniroyal. She now challenges only the district court's grant of summary judgment in favor of Emhart.

## II. ANALYSIS

### A. Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir.2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Design defect

Ohio law authorizes recovery for injuries incurred as a result of a defectively de-

signed product. Ohio Rev.Code § 2307.75(A). To establish a design-defect claim, a plaintiff must prove that (1) the product had a design defect, (2) this defect existed at the time the product left the control of the manufacturer, and (3) the defect was the proximate cause of the injury for which recovery is sought. *State Farm Fire & Cas. Co. v. Chrysler Corp.,* 37 Ohio St.3d 1, 523 N.E.2d 489, 493 (1988).

Sandra Miller asserts a design-defect claim against Emhart, alleging that the Banbury Mixer #1 had various design flaws that led to her husband's death. Her theory of recovery is based on the premise that Miller was killed when he accidentally pulled the hopper-door lever into the "close" position while leaning into the opening to the hopper. She maintains that this accident would not have happened if (1) the control panel had been located farther away from the hopper door, (2) the hopper door had been operated by a dual-palm control mechanism that requires the use of two hands to open or close the door, or (3) the hopper door had had a guard that prevented the door from closing when an operator leans into the hopper-door opening. Each of these contentions is analyzed below.

### 1. Control panel

Sandra Miller first maintains that the control panel on the Banbury Mixer #1 was located too close to the hopper door, thus allowing her husband to reach the hopper-door lever while leaning into the opening to the hopper. Although she acknowledges that Emhart did not design the control panel, she nevertheless maintains that Emhart should have at least specified that the control panel must not be placed near the hopper door. Emhart's failure to do so, in her view, makes it responsible for Miller's death.

To establish a design-defect claim based upon the location of the control panel, Sandra Miller must prove that her husband in fact closed the hopper door on himself by pulling the lever into the "close" position. Otherwise, the location of the control panel could not have been a proximate cause of Miller's death. There is no evidence, however, to support the proposition that Miller closed the hopper door on himself. Miller was alone at the time of his death, so no witnesses observed what actually transpired prior to the closing of the hopper door. But the employees who discovered Miller's body recall seeing the lever that operated the hopper door in the "neutral" position. If Miller had closed the hopper door on himself, this lever would have been in the "close" position. *See DaSilva v. American Brands, Inc.,* 845 F.2d 356, 359 (1st Cir.1988) (holding that the jury had sufficient evidence to infer that an operator who was crushed by the hopper door of a Banbury Mixer had accidentally closed the door on himself where, among other things, the hopper-door lever was found in the "close" position at the time of the operator's death).

In addition, Sandra Miller concedes that the hopper door would have automatically closed if the Banbury Mixer #1 experienced a power outage or dip. But this "automatic-close" feature was not designed by Emhart. The feature was instead added by Uniroyal after it took possession of the mixer. Nothing in the record precludes the possibility that a power fluctuation triggered the automatic-close mode on the Banbury Mixer #1, thereby causing the hopper door to close on Miller without involvement of the control panel.

Sandra Miller maintains, however, that it is more likely that her husband closed the hopper door on himself. She bases this contention on the affidavit of her expert, Dr. Richard Harkness, who opined

that Miller "made a mistake and actuated the control which caused the hopper door to close." Prior to filing this affidavit, however, Dr. Harkness had acknowledged in his deposition and in a letter to Sandra Miller's counsel that both a power fluctuation and human error were equally probable causes of the hopper door closing on Miller. He offered his new opinion only after Emhart filed its motion for summary judgment, in which Emhart pointed out that it designed the Banbury Mixer #1 in such a way that the hopper door would *not* close if the mixer experienced a power fluctuation, and that Uniroyal later added the automatic-close mode.

Emhart contends that we should strike Dr. Harkness's affidavit because it contradicts his earlier opinion regarding what caused the hopper door to close. *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir.1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony."). But, as explained below, Dr. Harkness's affidavit does not create a genuine issue of material fact on the issue of proximate causation even if the affidavit is considered. We thus have no reason to decide whether the district court erred in not striking the document.

Dr. Harkness states in his affidavit that "new evidence" led him to conclude that Miller most likely closed the hopper door on himself. He specifically refers to the affidavit of Alvin Biggert, one of Miller's fellow employees at Uniroyal. Biggert claimed that Miller often leaned into the hopper-door opening while performing the dust-stop flushing procedure, and that when he saw Miller's body stuck in the opening to the hopper on February 2, 1997, Miller's right arm was pointed toward the control panel.

These statements, however, lend no support to Dr. Harkness's revised conclusion as to what caused the hopper door to close, because Emhart never disputed that Miller was leaning into the hopper-door opening at the time of his death. Biggert's assertion that Miller often leaned into the hopper thus sheds no new light on the circumstances surrounding Miller's death. Furthermore, although Biggert described Miller's arm as extending toward the control panel, Dr. Harkness never explained how Miller could have used that arm to close the hopper door on himself if the lever that operates the hopper door was not in the "close" position at the time of his death.

Sandra Miller argues that Dr. Harkness did not have to address the position of the hopper-door lever at the time of her husband's death because the lever's position remains unclear. She claims that the employees who arrived on the scene after Miller's death disagree as to the lever's position. Three of these employees remember seeing the lever in the "neutral" position, but Sandra Miller maintains that a fourth employee, Ruben Rodriguez, stated that he saw the lever in the "open" position. Rodriguez, however, mentioned only that he saw a light indicate that the hopper door was open. He never described the position of the hopper-door lever. Moreover, even if Rodriguez had seen the lever in the "open" position, this would not change the fact that *no* witness recalls seeing the lever in the "close" position at the time of Miller's death. Sandra Miller also contends that an employee might have moved the lever when attempting to free her husband from the hopper door, yet no employee reported either moving the lever or seeing someone else do so.

Thus, even when viewed in a light most favorable to Sandra Miller, the evidence

presented in this case allows the jury to only speculate as to what caused the hopper door to close on her husband. But proximate causation is not a matter that may be left to speculation. *Whiting v. Ohio Dep't of Mental Health,* 141 Ohio App.3d 198, 750 N.E.2d 644, 647 (2001) (recognizing that it is "well settled" that proximate causation is not subject to "speculation"); *Fogle v. Cessna Aircraft Co.,* No. 90AP–977, 1992 WL 10272, at *4 (Ohio Ct.App. Jan. 16, 1992) (unpublished table decision) (holding that the "jury will not be permitted to speculate when defendant's conduct is merely one of several possible causes of plaintiff's injuries"). "[W]here the facts from which an inference of probable proximate cause must be drawn are such that it is as reasonable to infer other causes, plaintiff has failed to supply proof of probable cause." *Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.,* 42 Ohio St.2d 122, 326 N.E.2d 651, 656 (1975). Without evidence showing that it is more likely than not that Miller closed the hopper door on himself, Sandra Miller cannot establish that the location of the control panel was a proximate cause of her husband's death. *Fogle,* 1992 WL 10272, at *4 ("There must be some proof upon which the trier of fact can reasonably conclude that it is more likely than not that the allegedly defective condition caused the plaintiff's injuries.").

### 2. Dual-palm control mechanism

Sandra Miller next maintains that Emhart should have required that a dual-palm control mechanism be used to operate the hopper door on the Banbury Mixer #1. Like the proximity of the control panel, however, the absence of a dual-palm control mechanism could have caused Miller's death only if he accidentally closed the hopper door on himself. Lacking sufficient evidence that Miller did so, Sandra Miller cannot sustain a design-defect claim based upon Emhart's failure to mandate the use of a dual-palm control mechanism as a means of operating the hopper door.

### 3. Door guard

Sandra Miller is thus left with her contention that the Banbury Mixer #1 was defectively designed because the hopper door was not equipped with a guard. The lack of a door guard, unlike the alleged design defects discussed above, could have contributed to Miller's death without regard to what caused the hopper door to close on him. In other words, even if the hopper door closed because of a power fluctuation, a guard would have prevented the door from closing on Miller. We must therefore consider whether the absence of such a guard constitutes a design defect.

Ohio law provides two standards for determining whether a product contains a design defect. First, a product is defectively designed if, "[w]hen it left the control of its manufacturer, the foreseeable risks associated with its design or formulation ... exceeded the benefits associated with that design ...." Ohio Rev.Code § 2307.75(A)(1). Second, a product has a defective design if "[i]t is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Ohio Rev.Code § 2307.75(A)(2).

But a product is not defective under either of the above standards if, when the product left the manufacturer's control,

> a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in

introducing the product into trade or commerce.

Ohio Rev.Code § 2307.75(F). The plaintiff bears the burden of presenting proof that such an alternative design or formulation was then available to the manufacturer. *McGrath v. General Motors Corp.*, 26 Fed. Appx. 506, 507 (6th Cir.2002) (unpublished table decision) (holding that a defendant is not liable for a design defect under Ohio law unless the plaintiff presents evidence of an alternative feasible design); *Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219, 1242 (6th Cir.1995) (holding that the plaintiffs could not sustain a design-defect claim because they had "not offered any evidence that there was an alternative design for [the product in question] that would have avoided the injuries in this case . . .").

■ In attempting to meet this burden, Sandra Miller maintains that "there were safe, economical and feasible guards that could have been placed on the hopper door that would have prevented the fatality herein." She provides no evidence, however, that these guards were available to Emhart when the Banbury Mixer # 1 left its control in 1966. Instead, she makes much of the fact that, at some point in the first half of the 1970s, Emhart began installing a pin-restraint system on its Banbury Mixers, a system that allows operators to manually lock the hopper door into an open position by turning levers on either side of the door. The purpose of the pins, however, was to keep the door in place when the power was off, not to prevent it from closing during a power interruption. There was in fact no possibility of such an accidental closure when the Banbury Mixer # 1 was designed by Emhart, because Uniroyal added the automatic-close feature after taking possession of the mixer. In any event, nothing in the record indicates that this system was a

feasible design option in 1966. Likewise, despite Dr. Harkness's opinion that an interlocking guard could have prevented the hopper door from inadvertently closing, he offered no analysis as to whether this type of guard was available to Emhart when it sold the Banbury Mixer # 1.

Sandra Miller therefore failed to raise a genuine issue of material fact as to whether the absence of a door guard on the Banbury Mixer # 1 constitutes a design defect. For this reason, as well as the reasons set forth above in Parts II.B.1. and II.B.2., we conclude that the district court did not err in granting summary judgment to Emhart on Sandra Miller's design-defect claim.

## C. Failure to warn

Under Ohio law, a manufacturer is liable where its unreasonable failure to warn of a risk associated with its product causes injury. Ohio Rev.Code § 2307.76(A). A plaintiff establishes a failure-to-warn claim by first showing that the manufacturer had a duty to issue a warning with regard to its product, but failed to do so. *Freas v. Prater Constr. Corp., Inc.*, 60 Ohio St.3d 6, 573 N.E.2d 27, 30 (Ohio 1991) (setting forth the general elements of a products liability claim based upon negligence); *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177 (Ohio 1990) (Syllabus ¶ 3) ("The standard imposed upon the defendant in a strict liability claim grounded upon an inadequate warning is the same as that imposed in a negligence claim based upon inadequate warning."). The plaintiff must also show that the absence of a warning proximately caused the injury for which recovery is sought. *Freas*, 573 N.E.2d at 30.

In the present case, Sandra Miller claims that Emhart had a duty to warn those who operate the Banbury Mixer # 1 to stand clear of the hopper door while the

mixer is in use. She maintains that, absent such a warning, operators would be unaware of the risks associated with leaning into the opening to the hopper. According to Sandra Miller, these risks arise from the same factors upon which she based her design-defect claim; namely, the proximity of the control panel to the hopper door, the lack of a dual-palm control mechanism to operate the door, and the absence of a door guard. She points out that, despite the alleged risks arising from these design features, Emhart never issued any safety warnings with regard to the operation of the hopper door.

■ Emhart had no duty to issue any such warning, however, if the risk of serious injury or death associated with leaning into the hopper-door opening was "open and obvious." Ohio Rev.Code § 2307.76(B) ("A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge."); *Koepke v. Crosman Arms Co.,* 65 Ohio App.3d 1, 582 N.E.2d 1000, 1001 (1989) (recognizing that "manufacturers ... do not have a duty to warn of dangers that are open and obvious to the user of a product"), *abrogated on other grounds by Perkins v. Wilkinson Sword, Inc.,* 83 Ohio St.3d 507, 700 N.E.2d 1247 (1998). The fact that the hopper door was made of a thick plate of steel and controlled by powerful pneumatic air pressure was apparent to those who operated the Banbury Mixer # 1. Moreover, the operators could readily perceive that the control panel was located near the hopper door, that the door was operated by a single lever rather than a dual-palm control mechanism, and that the door had no guard. The operators, including Miller, therefore either knew or reasonably should have known of the danger that would result from placing their bodies into the opening to the hopper while the mixer was in use. Furthermore, no one had ever before been injured by the hopper door of the Banbury Mixer # 1 in the 31 years that it had been in operation at the Uniroyal facility.

Sandra Miller nevertheless argues that the risks associated with the hopper door were not open or obvious because "operators regularly looked into the Banbury [mixers] to look for contaminants and to get a sample of the product." This argument presumes that operators would not subject themselves to an open and obvious danger. Not all individuals, however, are averse to such dangers. *E.g., Frame v. Allen,* No. 01AP–698, 2001 WL 1661981, at *3 (Ohio Ct.App. Dec. 31,2001) (unpublished table decision) (holding that a homeowner had no duty to warn the plaintiff of the dangers associated with walking across a smooth concrete floor with wet rubber sandals); *Heyne v. City of Celina,* No. 10–01–05, 2001 WL 1126356, at *2 (Ohio Ct. App. Sept.25, 2001) (unpublished table decision) (holding that a property owner had no duty to warn the plaintiff of the risks involved with power washing the metal roof of a horse barn in close proximity to an overhead electrical line). Thus, evidence that operators often leaned into the hopper-door opening does not indicate that the dangers involved in doing so were hidden.

But Sandra Miller contends that Emhart regularly inspected the Banbury Mixer # 1 at Uniroyal's plant, and therefore had a continuing duty to warn Uniroyal employees about the dangers associated with the hopper door. We find no merit in this argument, however, because these dangers were open and obvious. Emhart therefore had no duty to issue any warning about them. Ohio Rev.Code § 2307.76(B).

Absent any duty to warn on the part of Emhart, Sandra Miller is unable to sustain her failure-to-warn claim. We therefore conclude that the district court did not err in granting summary judgment in favor of Emhart. Furthermore, because Sandra Miller has not offered sufficient evidence to support either her design-defect or failure-to-warn claims, we need not consider Emhart's assertion of the assumption-of-the-risk defense.

## III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the judgment of the district court.