EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
This matter is before the Court on Defendant E. I. du Pont de Nemours and Company's Motion to Exclude "Narrative" Testimony (ECF No. 2821). That Motion is fully briefed. (ECF Nos. 3200, 3548.) For the reasons that follow, the Court DENIES Defendant's Motion.
I.
Defendant E. I. du Pont de Nemours and Company ("DuPont") directs its Motion to expert witnesses who were retained by Plaintiff Carla Marie Bartlett and Plaintiff John M. Wolf, the first two Plaintiffs selected for trial ("Trial Plaintiffs") in this multidistrict litigation ("MDL"), Mrs. Bartlett's case is scheduled for trial on September 14, 2015, and Mr. Wolf is slated to try his case on November 30, 2015.
The Trial Plaintiffs both allege that they are members of the class of individuals who are permitted under a contractual agreement ("Leach Settlement Agreement") to file claims against DuPont based on six human diseases ("Linked Diseases") that they believe were caused by their exposure to ammonium perfluorooctanoate ("C-8" or "PFOA") discharged from DuPont's Washington Works plant into their drinking water. (Leach Settlement Agreement; ECF No. 820-8.) Mrs. Bartlett alleges that she suffered from kidney cancer and Mr, Wolf claims that he suffers from ulcerative colitis. Both of these human diseases are Linked Diseases. The Trial Plaintiffs allege claims for, inter alia , personal injury and punitive damages.
In its defense, DuPont asserts that it "neither knew, nor should have known, that any of the substances to which [the Trial Plaintiffs were] allegedly exposed were hazardous or constituted a reasonable or foreseeable risk of physical harm by virtue of the prevailing state of the medical, scientific and/or industrial knowledge available to DuPont at all times relevant to the claims or causes of action asserted by [the Trial Plaintiffs]." (DuPont's Answer to Bartlett Compl. ¶ 232; ECF No. 35.) DuPont offers various expert witnesses to support its defenses. Relevant to the present inquiry, DuPont offers expert testimony regarding the scientific methods it utilized to support its decisions about the release of C-8 from its Washington Works plant and its communication about the health effects of the releases of C-8. DuPont proffers Shane A. Snyder, Ph.D.,[1] who offers several opinions, including the following:
*923 Analytical detection limits for quantification of chemicals in water are continually evolving, and PFOA was not able to be accurately and precisely identified and quantified in ng/L concentrations in water until the 2000's, when advances in liquid chromatography and tandem mass spectrometry methods became available and applied to PFOA.
....
From before the 1980s and forward, DuPont has been proactive in continuously pursuing increasingly robust, sensitive, accurate, precise, and reproducible analytical methods for measuring PFOA in media, including water, resulting m numerous publicly-available peer-reviewed publications and contributions to the relevant science.
(Snyder Report at 11, ECF No. 2807-5)
The Trial Plaintiffs have offered James S. Smith, Ph.D., CPC,[2] to provide opinions on the same subject matter. (Smith Report, ECF No. 3441-9; Smith Dep., ECF No. 165-66.) Specifically, Dr. Smith was retained to testify on:
1) the precision, accuracy, representativeness, completion, and comparability (PARCC) of the methods used by DuPont to measure the concentrations of [PFOA] in drinking water; 2) the extent of DuPont's knowledge of the PARCC of the reported PFOA concentrations in drinking water over time; 3) the actual error of the PFOA concentrations in drinking water over time; and 4) the accuracy of DuPont's representations to the public and others concerning the levels of PFOA concentrations in drinking water.
(Smith Report at 1.)
Dr. Smith concludes his Report with a summary of the opinions he reaches in his Report as follows:
1. Methods used by DuPont to measure the concentration of PFOA in water are not accurate and have led to reported levels of PFOA in drinking water supplies that are lower than the true value.
2. DuPont was aware that the PFOA levels in drinking water were reported lower than the true concentration values, and DuPont had the knowledge and expertise to correct the discrepancy in the data.
3. Prior to the water analysis performed by Exygen in 2001, the PFOA concentrations in drinking water were higher than reported by DuPont and exceeded 1 ppb on numerous occasions.
4. The information concerning the October letter to the LPSD water customers about PFOA concentrations in drinking water was not accurate and PFOA concentrations were underreported.
5. Forensic techniques to age date the PFOA using the isomers of PFOA were not performed. The FC-143 produced by 3M and used by DuPont at the Washington Works plant prior to 2002 included up to 30% C-8 branched-chain isomers that were not present in the APFO produced by the telomerization process, which was used by DuPont after 2002. According to Hyeong-Moo Shin, et al., PFOA entered the municipal water supplies via air transport and deposition of PFOA from the Washington Works *924 plant. It is unknown whether this PFOA is from the use of FC-143 from 3M by the Washington Works facility, or C-8 from the PFOA made by DuPont and used after 2002 when the 3M PFOA was no longer available. Isomer analysis could be of forensic aid in the transport mechanism as well as making the analytical results more reliable.
6. Three decades of qualitative and quantitative analysis of PFOA for the health and safety of employees and the Washington Works plant community by one of the world's major chemical companies shows that the analytical sampling and analysis are still questionable due to accuracy, precision, representativeness, completeness, and comparability concerns. None of these analytical chemistry concerns apply to other chemicals of considerable and probable health concerns, such as dioxin, or polynuclear aromatic hydrocarbons (PAHs), or polychlorinated biphenyls (PCBs). All of these substances are semi-volatile compounds like PFOA and their sampling and analysis can be accomplished to very low concentrations accurately and precisely. There is a disconnect in the approach to accurate and precise analytical chemistry of PFOA. This disconnect has led to DuPont's underestimation and underreporting of PFOA concentrations and the reluctance to correct the analytical system.
(Smith Report at 66-67.)
The Trial Plaintiffs also offer Robert W. Johnson to opine on the financial condition of DuPont in the event the trial goes to a punitive damages phase. (Johnson Report, ECF No. 2811-5; Johnson Dep. Tr., ECF No. 2809-6.)
In its Motion, DuPont moves for exclusion of the entire testimony of both Dr. Smith and Mr. Johnson as unreliable. DuPont also contends that Dr. Smith's testimony should be excluded because it is unfairly prejudicial, confusing, misleading, and needlessly cumulative.
II.
DuPont's motion is governed by Rules 702 and 403 of the Federal Rules of Evidence.
Rule 702 of the Federal Rules of Evidence governs the use of expert testimony, providing:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case,
Fed. R. Evid. 702.
This rule, as amended in 2000, reflects the Supreme Court's decisions in Daubert v. Merrell Dow Pharm., Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Co. v. Carmichael , 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("In Daubert the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in Kumho clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").
This Court has broad discretion to determine whether to admit or exclude expert testimony. In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 528 (6th Cir. 2008) ("[W]e will not substitute our own *925 judgment for that of the district court and will reverse an evidentiary decision "only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." (citation omitted) ). The burden is on the party proffering the expert report and testimony to demonstrate by a preponderance of proof that the opinions of their experts are admissible. Nelson v. Term. Gas Pipeline Co. , 243 F.3d 244, 251 (6th Cir. 2001).
Determining the admissibility of expert testimony entails a flexible inquiry and any doubts should be resolved in favor of admissibility. Daubert , 509 U.S. at 594, 113 S.Ct. 2786 ; Fed. R. Evid. 702 advisory committee's notes, ("[A] review of the case law... shows that rejection of the expert testimony is the exception rather than the rule."); Jahn v. Equine Services, PSC , 233 F.3d 382, 388 (6th Cir. 2000) (stating that in Daubert "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony" (internal quotations omitted) ). Additionally, if the evidence is deemed admissible by a court, but it is ultimately found "insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment." Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ; see also Fed. R. Civ. P. 50.
As to Rule 702, the Sixth Circuit explains:
Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Id Third, the testimony must be reliable. Id. Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." Id.
In re Scrap Metal Antitrust Litiga., 527 F.3d at 528-29.
A. Federal Rule of Evidence 403
Rule 403 of the Federal Rules of Evidence permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Whether to exclude evidence under Rule 403 is a matter within the trial court's discretion. Paschal v. Flagstar Bank , 295 F.3d 565, 576 (6th Cir. 2002). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value," Id.
III.
The Court will first consider DuPont's (A) request to exclude the testimony of Dr. Smith, and then will address its (B) request for exclusion of the testimony of Mr. Johnson
A. Dr. Smith
In general, DuPont moves to exclude Dr. Smith's testimony as improper narrative testimony of the historical record of DuPont's actions related to C-8 at its *926 Washington Works plant. Initially, the Court notes that DuPont agrees with the Trial Plaintiffs' position that reliance upon historical documents does not automatically brand an expert opinion suspect:
DuPont agrees that in appropriate circumstances an expert may rely on historical corporate documents as the foundation for his or her expert analysis and reasoning. Indeed, as Plaintiffs note, DuPont's expert, Dr. Shane Snyder, relied in part on DuPont's corporate documents in forming his technical opinions. But as even the cases cited by Plaintiffs recognize, an expert may not simply read, summarize, and parrot back those documents to the jury.
(DuPont's Reply at 6) (citing as examples In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig. , 711 F.Supp.2d 1348, 1375 (M.D. Ga. 2010) (stating that mere "parroting" by an expert is "not appropriate"); In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig. , 2014 WL 3557345, at *7, 2014 U.S. Dist. LEXIS 97798, at *25-26 (N.D. Tex. July 18, 2014) (even if the record evidence is voluminous, narrative testimony is not admissible unless it "involve[s] scientific or technical data and such narrative summary would assist the trier of fact in understanding the documents. ") ).
DuPont continues, asserting that unlike Dr. Snyder,
Dr. Smith's primary "expert" function is to "review and summarize" select record evidence and parrot back those documents to the jury. This is the quintessential example of inadmissible, narrative testimony.
(DuPont's Reply at 7.) DuPont maintains that "Dr. Smith functions as little more than a narrator.... [and that] even when Dr. Smith finally discusses his actual opinions, it is clear that these opinions are not based on any specialized knowledge." (DuPont's Mot. at 3-4) (relying on In re Fosamax Prods. Liab. Litig. , 645 F.Supp.2d 164, 192 (S.D. N.Y. 2009) (stating that an expert cannot "merely read, selectively quote from, or 'regurgitate' the evidence"); Arista Records LLC v. Usenet.com, Inc. , 608 F.Supp.2d 409, 424 (S.D. N.Y. 2009) (indicating that an "expert who simply regurgitates" information "provides no assistance to the trier of fact through the application of specialized knowledge"); In re Prempro Prods. Liab. Litig. , 554 F.Supp.2d 871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?") ).
DuPont concludes that, Dr. Smith "intend[s] to recite a factual narrative for the jury, based on [his] reading of uncomplicated internal corporate emails, documents, and public information that is not beyond the ken of a jury, [he] will not offer 'expert' testimony that would do anything to assist the jury in coming to a greater understanding of the evidence or facts at issue." (DuPont's Reply at 2); (DuPont' Mot. at 3) ("Dr. Smith's narrative testimony is a classic example of 'junk science' in which a witness has no reliable methodology and seeks to tell a story to the jury, with a tilt favoring one side, rather than letting the jury reach its own conclusion."). Finally, DuPont argues that its expert, Dr. Snyder, "was critical of Dr. Smith and did not agree with his methods." (DuPont's Reply at 8) (citing to Snyder Dep. at 232) ("My feeling is that Dr. Smith did not understand standard [ad]dition and did not fully understand isotope dilution. I think he misconstrued the facts.... [and] I think that could be very confusing for a jury.") ). This Court finds DuPont's arguments not well taken.
DuPont's assessment of Dr. Smith's opinions and testimony is too limited. A review of Dr. Smith's expert report unequivocally *927 shows that he does not merely parrot back uncomplicated corporate documents containing information within the ken of a jury.
In his Report, Dr. Smith first reviews the relevant historical record, which contains over thirty years of studies that analyzed the presence of C-8 in different medians, e.g. , water, soil, and blood, around DuPont's Washington Works plant. The studies reflect complex chemical equations and utilization of numerous methodologies specific to analytical chemistry. (Smith Report at 9-19.)
Following that review, Dr. Smith utilizes his expertise and training in analytical chemistry, and his knowledge of how the state of the art methods developed over time, to contextualize the case specific facts against general developments in analytical methods, including drinking water standards and the analytical methods for DuPont's monitoring programs. Dr. Smith addresses the chronology of C-8 analysis and the methods DuPont utilized to analyze its presence and effects beginning in 1984 when DuPont first collected water samples in the vicinity of the Washington Works plant. Dr. Smith reviews the methodology DuPont utilized in the 1984 studies that were evaluated at DuPont's Experimental Station in Wilmington, Delaware, providing:
The water samples were analyzed by gas chromatography /electron capture detector (GC/ECD) using a modification of DuPont's Method ES-567, a method for C-8 in the blood. Method ES-567 was modified for water analysis by 1) using a 10 gram (10mL) aliquot of the sample, 2) lyophilization (freeze drying) for 18-20 hours, and 3) reducing the amount of internal standard perfluorodecanoic acid (C-10) added.
Id. at 20 (citations omitted). Dr. Smith goes on to explain the Experimental Station's analytical results:
The Experimental Station reported the analytical results in units of ng (nanograms) F (fluoride) per g (Gram) water or parts per billion (ppb). The report also states that, "The results are expressed as ppb fluoride where ppb F = 0.688 × ppb perflourooctanoate." This conversion factor is derived from the faction by weight of fluorine in perfluorooctanoic acid or 15 × 19/414 = 0.688. Another way of saying this is ppb F × 1.45 = ppb perfluorooctanoate where 1/0.688 = 1.45 or rounded to 1.5. A linear calibration curve was used for quantitation over a range of 0.4 to 1 ppb as fluoride (F) or 0.6 to 1.5 ppb perfluorooctanoate. No C-8 peak was detected in spiked standards at 0.1, 0.2 or 0.3 ppb F. A reproducible and detectable peak was seen at 0.4 ppb F (0.6 ppb perfluorooctanoate) and this concentration was used as the detection limit.
Id. at 20-21 (internal citations omitted).
Dr. Smith next reviews DuPont's internal memorandum related to the 1984 testing, DuPont's use of other methods, including the "Stafford method" and a "detector response vs. PFOA isomer" method. Id. at 21-23. DuPont continued this type of detailed analysis chronologically for each new method used by DuPont related to C-8. Id. at 23-51. This analysis includes, for example, explanations of the methods employed by CH2M Hill from 1991 through 1998, Lancaster Laboratories until October 2001, and those later used at Exygen Research, Inc. which "developed a new method for analysis of FC-143 utilizing liquid chromatography /tandem mass spectrometry (LC/MS/MS) in the negative ion mode." Id. at 46-51 (internal citations omitted). During this analysis, Dr. Smith also refers to the scientific knowledge available on which *928 he relied to reach his opinions. By way of example, in evaluating the new method developed at and utilized by Exygen Research, Dr. Smith relies upon his knowledge of the subject matter as well as scholarly publications on the subject matter and opines:
The LC/MS/MS method used by Exygen depends on the electrospray ionization of PFOA to be consistent between the standards and the samples. In the Exygen method the straight-chain PFOA and the branched-chain isomers elute as one peak. According to Jonathan W. Martin et al., in a 2004 paper co-authored by Mary Kaiser of DuPont, "Isomers respond to electrospray ionization (ESI) differently, and thus the relative areas in the chromatogram do not necessarily reflect the relative amounts in the standard," Thus, the isomers content in the standards should match isomer ratio of the samples. Martin et al. also state that "coeluting matrix components can either suppress or enhance ionization, which must be controlled to achieve maximum accuracy." Procedures to control the matrix effects can include matching the standard matrix to the samples, the method of standard additions, and isotope dilution. Martin et al, write: "standard addition quantitation which involves spiking successive known quantities of a standard into the sample and reanalyzing, is common in atomic absorption spectroscopy and an acceptable technique to use when matrix effects are unavoidable." However, Martin et al. also state, "Isotopically labeled perfluoroalkyl internal standards (isotope dilution) are probably the most appropriate approach for negating ionization effects because they will have the same retention times as their natural analogues (excluding any isomeric separation)." Exygen did not use any of these procedures for the water samples collected from the community drinking water systems. Therefore, it raises questions about the accuracy of Exygen's water analysis for PFOA.
Id. at 49.
Dr. Smith ultimately summarizes his report as follows:
In 1984 DuPont was aware that APFO was present in the drinking water system served by the LPSD and in Little Hocking Water Association by virtue of its own sampling and analysis. These samples were analyzed by GC/ECD by DuPont's own laboratory at the Experimental Station, Wilmington, Delaware. Although DuPont questions the analytical accuracy of their results prior to January 1991, the detection of this substance in the community drinking water occurred on more than one occasion between 1984 and 1991. These results are probably biased low because DuPont only measured the main straight-chain isomer. However, because of the lack of quality assurance/quality control with the Experimental Station results such as surrogates and matrix spiking, the accuracy and precision of this data are not known.
From September 1991 through November 1998 DuPont used CH2M Hill to analyze the drinking water samples by GC/ECD. CH2M Hill's method included internal standards, surrogates, and matrix spikes. CH2M Hill only measured the main straight-chain isomer of PFOA. DuPont intentionally[3] chose CH2M Hill *929 to analyze the drinking water samples for a period of seven years even though DuPont knew that CH2M Hill's results were significantly lower than the Experimental Station's results for split samples and "CH2M Hill experienced poor surrogate recovery." DuPont was aware that CH2M Hill's "numbers may be low on the absolute basis." DuPont did not voluntarily stop using CH2M Hill for C-8 water analysis but only switched laboratories after CH2M Hill's went out of business in the Fall of 1998.
At DuPont's direction, Lancaster Laboratories used the CH2M Hill's method with some minor changes to analyze drinking water samples submitted by DuPont from February 1999 through October 2001. Lancaster experienced poor surrogate recoveries and poor recoveries of FC-143 spiked into samples and blanks. DuPont was aware of the poor recoveries and continued having Lancaster analyze the samples using the CH2M Hill method even though DuPont knew the results were biased low. Lancaster proposed an improved method using GC/MS with good surrogate recoveries and good FC-143 spike recoveries. Preliminary results from Lancaster's proposed method yielded higher results than the traditional CH2M Hill method but DuPont never authorized the use of this improved method on any of the drinking water samples from LPSD or Little Hocking. Instead DuPont intentionally chose Exygen's LC/MS/MS method that DuPont knew did not include surrogates to monitor if the method was performing properly.
Id. at 51-52 (internal citations omitted).
The valid challenges that DuPont, and Dr. Snyder, make go more to the accuracy and import of Dr. Smith's conclusions, which "bear on 'the weight of the evidence rather than on its admissibility.' " Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co. , 90 F.Supp.3d 746, 757 (S.D. Ohio 2015) (citing In re Scrap Metal Antitrust Litig. , 527 F.3d at 529-31 ; Jahn v. Equine Services , 233 F.3d 382 (6th Cir.2000) ; Bonne v. Premier Athletics , No. 3:04-CV-440, 2007 WL 3181289, at *7-8 (E.D. Tenn. Oct. 29, 2007) ("Questions about the certainty of the scientific results are matters of weight for the jury.") ). "The task for the district court in deciding whetheir an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal , 527 F.3d at 529-30 ). However, this Court's "gatekeeper role ... is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" evidence a party finds lacking. Wellman v. Norfolk & Western Ry. , 98 F.Supp.2d 919, 924 (S.D. Ohio 2000) (quoting Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ).
The Court concludes that the Trial Plaintiffs have met their burden of demonstrating that the opinions and testimony of Dr. Smith are admissible. Dr. Smith's opinions rest on a reliable foundation and the method he utilized, i.e. , drawing conclusions from a set of observations based on extensive and specialized knowledge and experience, is the same appropriate methodology used by Dr. Snyder. See In re Fosamax , 645 F.Supp.2d at 190-91 ("The Court further finds that [the expert] has followed an appropriate methodology. An expert is permitted to draw a conclusion *930 from a set of observations based on extensive and specialized experience."). A lay jury cannot be expected to understand the analytical detection limits for quantification of a "semi-volatile compound like PFOA," which requires the use of methodologies such as the chromatography /electron capture detector and/or the liquid chromatography /tandem mass spectrometry. Dr. Smith's testimony, similar to Dr. Snyder's testimony, will certainly assist the jury. Additionally, the Court does not find Dr. Smith's testimony creates a danger of unfair prejudice, confusion of the issues, misleading of the jury, or needless presentation of cumulative evidence that would warrant exclusion under Federal Rule of Evidence 403.
B. Mr. Johnson
The Trial Plaintiffs offer economist Robert W. Johnson to "frame, in economic terms, the financial condition of [DuPont]," (Johnson Report at 1.) Mr. Johnson relies on statistics from publicly-available information such as Security and Exchange Commission ("SEC") filings, proxy statements, news releases from DuPont's website, and data from the Yahoo! Finance website. He opines that DuPont is a financially healthy and growing company.
DuPont moves to exclude Mr. Johnson's testimony as unreliable, arguing that he arbitrarily chose the information from the financial documents, admitting "that there were more financial numbers and metrics in the SEC filings than what he utilized in his report. (DuPont's Mot. at 10) (citing Johnson Dep. at 38-42.) DuPont further suggests that Mr. Johnson's testimony is suspect because he has testified as an expert witness in numerous cases. DuPont concludes that "Mr. Johnson's attempted regurgitation of publicly-available facts is thus 'junk science' that would not help the jury in any way." Id.
The Trial Plaintiffs respond that Mr. Johnson's testimony will be helpful to the jury and that DuPont's complaints about his testimony go to its weight, not its admissibility. Specifically, they argue that interpretation of the financial information analyzed by Mr. Johnson is a specialized field; that the average layperson would not be able to simply review DuPont's SEC filings, proxy statements, news releases, and data from the Yahoo! Finance website and come to an informed conclusion as to the financial condition of a multi-national corporation, such as DuPont. The Trial Plaintiffs' arguments are well taken.
As the parties both agree, DuPont's financial condition is at play if either Mrs. Bartlett's or Mr. Wolf's case goes to a punitive damages phase. In the Court's view, there are a limited number of ways to explore DuPont's financial condition. There are the SEC filings and proxy statements, which are admissible as admissions and excluded from the hearsay rule. These filings could be explained by counsel during closing arguments. However, that avenue would leave no room for clarifying questions and is a poor way to provide helpful information to the jury. On the other hand, Mr. Johnson, who is a qualified economist, could be questioned about the meaning of the documents presented to the jury and he would be subject to cross examination. DuPont can then explore the perceived weaknesses in Mr. Johnson's analysis and conclusions, as well as his work as an expert witness. These issues go to the weight of the evidence, not its admissibility. See In re Scrap Metal Antitrust Litig. , 527 F.3d at 529-31.
Thus, even though much of the testimony involved could be explained by counsel at closing, the Court thinks it is better for the jury to understand what the documents mean through the questioning of Mr. Johnson by counsel for both parties, *931 See Daubert , 509 U.S. at 594, 113 S.Ct. 2786 (any doubts should be resolved in favor of admissibility).
IV.
Based on the foregoing, the Court DENIES DuPont's Motion to Exclude "Narrative" Testimony (ECF No. 2821).
IT IS SO ORDERED.

Dr. Snyder holds a Bachelor of Arts degree in Chemistry and a Doctor of Philosophy in Zoology and Environmental Toxicology. (Snyder Report at 6.) Dr. Snyder is the Vice-President and Director of Total Environmental Solutions, Inc. He has "conducted environmental research for more than 20 years and has acted as an environmental consultant for over 15 years." (Snyder Report at 6.) He has lectured and published extensively in those areas.

Dr. Smith holds a Bachelor of Arts in Chemistry, a Doctor of Philosophy in Organic Chemistry, an N.I.H. Postdoctoral Fellowship in Organic Chemistry, and an N.I.H. Postdoctoral Fellowship in Organic Mass Spectrometry. (Smith Report at 68-72.) Dr. Smith is the President of Tillium, Inc. and also a chemist at that company. He has lectured and published extensively in his areas of study.

In a matter distinct from the motion addressed in this Opinion and Order, the Court will not permit Dr. Smith to describe DuPont's conduct as "intentional." No witness, even an expert, may opine on a party's state of mind. (See Evidentiary Motions Order No. 2) (addressing the law regarding state of mind testimony). State of mind and drawing of inferences on questions of fact are reserved to the jury.